**Katy HINES,**

v.

**GRAND CASINO OF LOUISIANA, L.L.C.—TUNICA–BILOXI INDIANS**

**No. CIV.A.00–2241–A.**

United States District Court, W.D. Louisiana, Alexandria Division.

Jan. 26, 2005.

---

Andree M. Cullens, Taylor Porter et al., Leslie Ellen Ayres, Taylor Porter et al., M. Lenore Feeney, Taylor Porter et al., Baton Rouge, LA, for Katy Hines, Plaintiff.

Amanda G. Clark, Forrester, Jordan & Dick, Jason A. Bonaventure, Forrester, Jordan & Dick, Shelly D. Dick, Forrester, Jordan & Dick, Victor L. Crowell, Forres-ter, Jordan & Dick, Baton Rouge, LA, for Grand Casinos of Louisiana L.L.C.—Tunica Biloxi, Defendant.

## RULING

DRELL, District Judge.

Before the Court are the following motions filed by defendant, Grand Casinos of Louisiana, L.L.C.—Tunica-Biloxi (hereinafter sometimes referred to as "Grand Casino"):

(1) Motion for New Trial, Pursuant to Federal Rules of Civil Procedure Rule 59 (Document No. 97);

(2) Renewed Motion for Judgment as a Matter of Law Pursuant to Federal Rules of Civil Procedure Rule 50(b) (Document No. 99); and

(3) Motion to Remit the Judgment, Pursuant to Federal Rules of Civil Procedure Rule 59(e) (Document No. 98).

Plaintiff, Katy Hines, has opposed the motions, and defendant has replied. Consideration of the motions was initially deferred while the parties attempted to resolve their disputes amicably. Unfortunately, the settlement conference held with Magistrate Judge James D. Kirk was unsuccessful. Therefore, the motions are now properly before the Court for decision. There is no need for oral argument. In light of the arguably unsettled law in this type of employment case, the Court has spent significant time reviewing the record and weighing the motions. After doing so, it is convinced there was ample evidence to support the jury's verdict on liability. However, the Court is equally certain the jury's damage awards were inconsistent with the facts and law as presented.

Considering the evidence and argument of counsel, and for the reasons that follow, defendant's Motion for New Trial is DE-

NIED; defendant's Renewed Motion for Judgment as a Matter of Law is DENIED; and defendant's Motion to Remit the Judgment is GRANTED.

## I. BACKGROUND

Katy Hines filed her Petition in the Twelfth Judicial District Court for the Parish of Avoyelles, Louisiana on September 6, 2000. Ms. Hines, who was formerly employed at Grand Casino, contended she was sexually harassed by her supervisor, Patrick Laborde, from shortly after she began work in 1994 through December 21, 1999, the date plaintiff alleged she was constructively discharged from her employment. (Document No. 1.) The matter was removed to this Court in October 2000. (Document No. 4.)

Trial by jury was held beginning February 17 and ending February 20, 2004. The jury found in favor of plaintiff and awarded her $150,000 in compensatory damages and $200,000 in punitive damages. (Document No. 92.) A judgment in accordance with the jury's verdict was signed on March 10, 2004. (Document No. 103.)

## II. MOTION FOR NEW TRIAL

Grand Casino articulates three separate grounds on which it contends it is entitled to a new trial under Fed.R.Civ.P. 59:(1) the lack of evidence to support the jury's verdict that a Title VII violation occurred; (2) jury confusion that tainted the verdict; and (3) unfair prejudice resulting from the admission of improper character evidence.

### A. New Trial Standard

■ "The standard at the trial level on a motion for a new trial is whether the verdict is against the clear weight of the

evidence or will result in a miscarriage of justice." *Pryor v. Trane Company*, 138 F.3d 1024, 1026, n. 3 (5th Cir.1998) [quoting *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir.1981) ]. The decision whether to grant or deny a motion for new trial under Fed.R.Civ.P. 59(a) "is within the sound discretion of the trial court." *Pryor*, 138 F.3d at 1026. "A motion for . . . new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." *Dresser–Rand Company v. Virtual Automation Inc.*, 361 F.3d 831, 838–839 (5th Cir.2004).

### B. Evidentiary Basis for the Verdict

■ In a Title VII supervisor sexual harassment suit, the plaintiff must first establish a *prima facie* case by showing: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition or privilege of employment;" and (5) the employer knew or should have known of the harassment and did not "take prompt remedial action." *DeAngelis v. El Paso Municipal Police Officers Assoc.*, 51 F.3d 591, 593 (5th Cir. 1995).

■ Ms. Hines alleges she suffered both *"quid pro quo"* and "hostile work environment" · sexual harassment.[1] The distinction between these two forms of harassment comes into play at the fourth step of plaintiff's *prima facie* case. At that point, if plaintiff establishes her refusal to submit to her supervisor's sexual

---

1. In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752–53, 118 S.Ct. 2257, 2264–65, 141 L.Ed.2d 633 (1998) (hereinafter sometimes referred to as *"Ellerth"*), the Supreme Court explained it prefers use of the term "tangible employment action" rather than

*"quid pro quo."* However, for the sake of clarity, the Fifth Circuit still uses the phrases *"quid pro quo"* and "hostile environment." See, for example, *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir.2002). Therefore, this Court continues the practice here.

demands resulted in a "tangible employment action," the employer may be held strictly liable for the actions of the supervisor.[2] Under these circumstances, the employer is presumed to have notice of the supervisor's behavior and may not advance the affirmative defense set forth by the Supreme Court in *Ellerth* and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).[3] If, however, plaintiff is unable to prove a "tangible employment action" was taken against her secondary to her rejection of the supervisor's illicit conduct, vicarious liability may only attach to the employer if plaintiff demonstrates the conduct was sufficiently severe or pervasive to establish a hostile work environment. *Ellerth,* 118 S.Ct. at 2264.

■■ Under this Court's understanding of the current Fifth Circuit law, once the plaintiff sets forth a *prima facie* case of Title VII employment discrimination,

> [T]he defendant then must articulate a legitimate, non-discriminatory reason for its decision ...; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence ... either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).

*Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004) (internal quotation marks and citations omitted).[4] If plaintiff proceeds under the mixed-motive alternative, 42 U.S.C. § 2000e–5(g)(2)(B) provides the employer with "a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff ... only [to] declaratory relief, certain types of injunctive relief, and attorney's fees and costs." *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 91 123 S.Ct. 2148, 2151, 156 L.Ed.2d 84 (2003).

■ In this case, there was sufficient evidence Ms. Hines, a female, was subjected to unwelcome harassment based on her sex. Ms. Hines testified she was offended by sexually suggestive comments regarding her clothing and body that Mr. Laborde made to her at work. Plaintiff also said Mr. Laborde "grabbed" her buttocks on one occasion, made grunting sounds at her, blew kisses at her, asked her about

---

**2.** As Justice Kennedy explained in *Ellerth,* "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 118 S.Ct. at 2268.

**3.** The *Faragher/Ellerth* affirmative defense allows an employer in a hostile work environment case to avoid vicarious liability if it can prove it "exercised reasonable care to prevent and correct promptly any ... sexual harassment, and ... the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise ...." *Casiano v. AT & T Corp.,* 213 F.3d 278, 284 (5th Cir.2000).

**4.** Although *Rachid* is a summary judgment case, it articulates the Fifth Circuit law concerning the "modified *McDonnell Douglas* approach," which has been applied to jury trials by at least one other case. *See Warren v. Terex Corporation,* 328 F.Supp.2d 641, 644 (N.D.Miss.2004), This Court takes this opportunity to add its voice to that of Judge Mills, who observed in *Warren,*

> A plaintiff's failure to prove the falsity of a defendant's stated nondiscriminatory reason has doomed many a discrimination case in this circuit, and the mixed-motive alternative set forth in *Rachid* will thus likely prove to be a lifeline for many discrimination cases which would otherwise not have survived summary judgment.

*Id.*

her undergarments, and told her she would have been promoted sooner if she had slept with him. According to Ms. Hines, she was humiliated and insulted by the comments and actions, and, on at least two occasions, she expressed her feelings to Mr. Laborde. She also told other employees and supervisors about some of the incidents. Although plaintiff admitted she participated in sexual jokes and made sexual gestures at work, she said she never did these things in front of Mr. Laborde, because she did not want to give him the chance to make additional offensive comments to her.

Kenneth Juneau, a former Grand Casino employee who eventually began dating plaintiff, told the jury he saw Mr. Laborde flirt with plaintiff at work, he heard Mr. Laborde ask plaintiff to go out for drinks, and he heard plaintiff refuse to go. Mr. Juneau also recalled an incident that occurred in the control room at work, during which Mr. Laborde made sexually suggestive comments about plaintiff while a group of people were sharing doughnuts. The witness said Ms. Hines appeared to be upset by the incident and walked out of the control room.

The jury was also presented with evidence from which it could conclude Ms. Hines suffered a "tangible employment action" that resulted from her rejection of Mr. Laborde's inappropriate demands. As

will be discussed more fully below in relation to the renewed motion for judgment as a matter of law, before plaintiff discussed Mr. Laborde's behavior with Louis Cook, the vice-president of security, Mr. Cook had recommended plaintiff for an award and had promoted her to the position of assistant shift supervisor despite plaintiff's problems with absenteeism. When plaintiff later asked Mr. Cook to transfer her from Mr. Laborde's shift (because Mr. Laborde had asked her to go out, and she had refused), Mr. Cook, who had undergone training regarding sexual harassment, did not authorize the shift change and did not report plaintiff's complaint to the human resources department. He did, however, demote plaintiff from the shift supervisor position after he received information from Mr. Laborde and another employee that plaintiff had been absent from work and/or her work station on several occasions. According to Mr. Cook, the demotion involved a loss of supervisory duties and at least some decrease in pay. (Excerpted testimony of Louis Cook ["Cook testimony"], pp. 3–19, and 43.) While plaintiff was under the impression her pay would not be reduced, she did understand that her duties would change significantly.[5]

There was also ample evidence from which the jury could conclude that the legitimate, non-discriminatory reasons giv-

---

5. In one of the supplemental memoranda defendant filed supporting its motion for new trial, Grand Casino argues that under the reasoning set forth in *Moayedi v. Compaq Computer Corp.*, 98 Fed.Appx. 335, 2004 WL 1161967 (5th Cir.2004), strict liability should not have been imposed on defendant. Specifically, Grand Casino contends there was insufficient evidence on which the jury could find any connection between the plaintiff's demotion and her rejection of Mr. Laborde's advances. (Document No. 122.) In addition to the fact *Moayedi* is an unpublished decision of no precedential value to this Court, that case is also easily distinguishable. Ms.

Moayedi simply assumed her harasser had somehow influenced her employer's tangible employment action. However, uncontested affidavits from the individuals who actually decided to fire Ms. Moayedi showed the harasser did not encourage plaintiff's termination. Rather, the harasser specifically asked that plaintiff be retained. In the instant case, however, Mr. Cook's testimony, as discussed in detail in the body of this ruling, provides an adequate basis on which a jury could find the required nexus between plaintiff's demotion and her refusal to succumb to Mr. Laborde's advances.

en by the Casino as justification for plaintiff's demotion, those reasons being her absence from work and/or her work station and her poor job performance, were not the only grounds on which she was demoted and ultimately terminated. Indeed, plaintiff had such a poor history of work attendance that she had been counseled "numerous times" about absenteeism before Mr. Cook promoted her to the shift supervisor position. (Cook testimony, p. 8.) However, after she complained about Mr. Laborde's actions, Mr. Cook used similar absenteeism problems (as reported by Mr. Laborde) to justify plaintiff's demotion. Thus, the jury could logically find Mr. Cook's decisions were also influenced by plaintiff's complaints and her refusal to go out with Mr. Laborde.

### C. Jury "Confusion?"

█ In response to the Court's request, defendant identified the specific language in the jury instructions with which it takes issue as follows:

In this case, you have heard evidence that the Defendant's treatment of the Plaintiff was motivated by the Plaintiff's gender and also by other lawful reasons. If you find that the Plaintiff's gender was a motivating factor in the Defendant's treatment of the Plaintiff, the Plaintiff's (sic) is entitled to your verdict, even if you find that the Defendant's conduct was also motivated by a lawful reason.

However, if you find that the Defendant's treatment of the Plaintiff was motivated by both gender and lawful reasons, you must decide whether the Plaintiff is entitled to damages. The Plaintiff is entitled to damages unless the Defendant proves by a preponderance of the evidence that the Defendant would have treated Plaintiff similarly even if the Plaintiff's gender had played no role in the employment decision.

(Document 105, pp. 1–2.) In support of its position that the instruction was ambiguous and misleading, defendant contends:

While the mixed motive instruction given in this case may not technically be a misstatement of the law, it is linguistically defective. If an instruction contains every element of a party's legal burden (sic) proof, it is useless if the sentence structure and semantics are self-contradicting and misleading to the jurors.

(Document 105, p. 4.)

But for this Court's substitution of the word "gender" for the word "sex" in the first paragraph of the challenged instruction, the language presented to the jury is identical to that approved by the Supreme Court in *Desert Palace,* 123 S.Ct. at 2152. While mixed-motive law is, admittedly, difficult to articulate in a readily comprehensible format, this Court's adherence to Supreme Court precedent certainly does not justify a new trial.

█ Grand Casino next argues that the jury's failure to answer question number five on the verdict form mandates a new trial. In that question, if the jury had previously found plaintiff was subjected to sexual discrimination in the form of sexual harassment or retaliation, it was asked to answer either "yes" or "no" to the following query:

Do you find by a preponderance of the evidence that Grand Casino would have treated Katy Hines similarly even if her gender had played no role in its employment decision?

Because the jury found plaintiff had been subjected to sexual discrimination, it should have answered question number five. It did not. It did, however, answer the remaining questions, which concerned compensatory and punitive damages.

■ The Seventh Amendment requires courts,

> [T]o make a concerted effort to reconcile apparent inconsistencies in answers to special verdicts if at all possible. Therefore, courts must attempt to reconcile the jury's findings, by exegesis, if necessary, before [they] are free to disregard the jury's verdict....
>
> \* \* \* \* \* \*
>
> In considering whether ... seemingly inconsistent verdicts may be reconciled, the court must view the evidence in the light most favorable to upholding the jury's decision by a finding of consistency. Additionally, the special verdicts must be construed in light of the surrounding circumstances of the case.

*Ellis v. Weasler Engineering Inc.*, 258 F.3d 326, 343 (5th Cir.2001), *amended on other grounds*, 274 F.3d 881 (5th Cir.2001) (citations and internal quotation marks omitted).

The question at issue in this case asked the jury whether defendant had proven the limited affirmative defense provided by 42 U.S.C. § 2000e–5(g)(2)(B), referenced above: that it would have treated Katy Hines similarly even if her gender had played no role in its employment decision. Under the statute, a response of "yes" to question number five would have precluded any award of damages, and a response of "no" would have allowed damages to be assessed. Although the jury did not mark "yes" or "no" as instructed, it did award plaintiff substantial damages. Logically, if it believed Grand Casino would have treated plaintiff similarly in the absence of gender considerations, the jury would not have imposed $200,000 in punitive damages. Obviously, the jury felt strongly that Ms. Hines's employer discriminated against her on the basis of her sex. After

conducting a thorough review of the record, this Court finds sufficient evidence from which the jury could have concluded defendant's actions were motivated by plaintiff's gender. This view of the case makes the jury's lack of response to question number five consistent with the remainder of the verdict form.

■ Defendant also argues the jury's submission of an additional document explaining the manner in which its damage award was calculated is indicative of juror confusion. On the contrary, the document, marked on the outside envelope "Basis of Computations," which the Court placed under seal without revealing its contents,[6] suggests the jury was firm in its intention to impose the kinds and amounts of damages reflected in the judgment.

### D. Admission of Character Evidence

■ Finally, Grand Casino contends the Court improperly allowed the jury to hear testimony regarding Mr. Laborde's prior intimate, consensual relationships with other employees of Grand Casino. Specifically, defendant complains the jury should not have heard Alexis Scroggs, Mr. Laborde's former girlfriend, testify "that when she left the employment of Grand Casinos, she told Laborde that she 'never wanted to see him again.'" (Document No. 97, p. 12.) Grand Casino also seeks a new trial on the ground that the prejudice instilled in the jury by Suzanne Brouillette's testimony outweighed its probative value. In particular, defendant argues:

> The court improperly allowed the jury to hear testimony from Ms. Brouillette that Laborde told her in a private conversation while the two were having a confrontation over their personal relationship that he could have the plaintiff

---

**6.** The Court has not reopened or considered the substance of this document in reaching its decision.

anytime he wanted her. Brouillette stated that Laborde was drunk when he made the comment and that it was clearly in the context of a "lover's quarrel"....

(Document No. 97, p. 11.)

Fed.R.Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence may be excluded under Fed. R.Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Evidence of a person's character or a particular character trait is generally not admissible for the purpose of proving the person acted in conformity with that character or trait. Fed.R.Evid. 404(a). Evidence of other acts may not be admitted to prove the character of a person in order to show he acted in conformity with that character, but "other acts" evidence may be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ...." Fed.R.Evid. 404(b).

All adverse evidence in a case could be called "prejudicial," because it refines the legal position of the opposing party. Thus, simply because Mr. Laborde's statements to Ms. Brouillette or Ms. Scroggs's comment to Mr. Laborde may have caused the jury to view him in a less favorable light, those remarks are not automatically inadmissible. Ms. Scroggs's words were spoken in an office at the casino. At least some of Mr. Laborde's statements to Ms. Brouillette were made in the hallway at work. Under such circumstances, both women's alleged status as Mr. Laborde's girlfriend does not make his statements less admissible than if they were made to any other employee. While Grand Casino would characterize the relationships between Mr. Laborde and Ms. Brouillette/Ms. Scroggs as separate and apart from this case, we believe it is impossible to do so for another reason: Suzanne Brouillette and Alexis Scroggs were also Grand Casino employees. When Mr. Laborde revealed his true feelings to Ms. Brouillette and when Ms. Scroggs did likewise to Mr. Laborde, it is impossible to say, in this Court's view, that the comments were not irretrievably intertwined with the issues here. The remarks were relevant to the issues of pretext, hostile work environment, and retaliation. The comments to Ms. Brouillette demonstrated Mr. Laborde's motivation and intent regarding his alleged treatment of plaintiff, Ms. Brouillette's co-employee. Ms. Scroggs's remarks helped the jury clarify the terms under which Ms. Scroggs left the casino. The probative value of the evidence outweighed any potential prejudice, and the presentation of the testimony to the jury does not warrant a new trial.

For all these reasons, defendant's motion for a new trial is DENIED.

### III. RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of the evidence, Grand Casino moved for judgment as a matter of law under Fed.R.Civ.P. 50 regarding plaintiff's claim for punitive damages. The motion was denied and has been properly renewed.

Rule 50 allows a court to render judgment as a matter of law against a party in a jury trial if the "party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ...." When considering a motion under Rule 50,

[T]he court must review all of the evidence in the record, draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. In reviewing the record as a whole, the court must disregard all evidence favorable to the moving party that the jury is not required to believe. (Citations and internal quotation marks omitted.)

*Coffel v. Stryker Corporation*, 284 F.3d 625, 631 (5th Cir.2002), *referencing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Punitive damages may be awarded against an employer for the actions of its agent in a Title VII case under the following circumstances:

(1) [The] agent is employed in a position of managerial capacity[;] (2) the agent acts within the scope of employment[;] and (3) the agent acts with malice or reckless indifference towards the federally protected rights of the plaintiff. However, such liability may not be imputed if the agent's actions are contrary to the employer's good faith effort to comply with Title VII of the Civil Rights Act. (Citations and internal quotation marks omitted.)

*Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 476–77 (5th Cir.2002), referencing *Kolstad v. Amer. Dental Ass'n.*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999).

In her petition, plaintiff alleged she was sexually harassed by Patrick Laborde, her supervisor. She further contended she complained to Louis Cook, Mr. Laborde's superior, who did nothing to stop the behavior and who instructed plaintiff "to work things out with Laborde." (Document No. 1, ¶ 8.)

The evidence adduced at trial showed Mr. Cook was employed by Grand Casino as vice-president of security. In this position, he had the authority to hire and fire individuals in the security department, to promote them, and to recommend they receive awards. When Mr. Cook first began working at Grand Casino, plaintiff was already employed as a security officer, and Mr. Cook became plaintiff's supervisor. (Cook testimony, pp. 3–8, and 17.)

Mr. Cook explained that, as a supervisor, he had an obligation to watch for potential sexual harassment in his department, to receive complaints of alleged harassment, and to communicate the information to the vice-president of the human resources department. Mr. Cook also testified he was familiar with Grand Casino's written policies and procedures concerning sexual harassment, which provided that improper sexual conduct in the workplace could include "sexual flirtations, advances, [or] propositions," and which required supervisors to refrain from engaging in actions that could be interpreted as being undertaken for personal gain. (Cook testimony, pp. 13, and 18–20.)

Regarding Ms. Hines, Mr. Cook acknowledged plaintiff came to his office and requested a transfer from Mr. Laborde's shift, because Mr. Laborde had "asked her to go out," and she had refused. (Cook testimony, pp. 10 and 14.) Mr. Cook further explained he did not think the situation rose to the level of sexual harassment, so he did not authorize the shift change, and he did not report the incident to the vice-president of the human resources department, as casino policy would normally have required. (Cook testimony, pp. 15 and 19.) Additionally, Mr. Cook testified he demoted plaintiff from her supervisory position because she had been absent from

work and/or her work station without permission, and her job performance was poor. He terminated plaintiff (after she failed to return to work) because "she had neglected her responsibilities of assistant shift manager on at least two occasions by spending excessive amounts of time in the bus drivers' lounge during duty hours rather than being on the floor." (Cook testimony, pp. 39–40, and 45.)

However, the jury was also presented with evidence that plaintiff had not been disciplined for excessive absenteeism, and, indeed, had even been promoted by Mr. Cook before she complained about Mr. Laborde's behavior. On one occasion prior to Ms. Hines's complaint, Mr. Cook had not followed Mr. Laborde's recommendation regarding disciplinary action against plaintiff for absenteeism. Further, Mr. Cook was aware before he terminated plaintiff that she was contending Mr. Laborde had given her permission to be in the bus driver's lounge. Additionally, Mr. Cook admitted that the information he had concerning plaintiff's poor job performance came from written counseling notices prepared by Mr. Laborde or another employee. (Exhibit D–14 and Cook testimony, pp. 7–9, 32, 37, and 55–56.)

Given these facts, a reasonable jury could certainly have found plaintiff satisfied the first two elements of her punitive damages claim: (1) that Mr. Cook was employed by defendant in a managerial capacity; and (2) Mr. Cook's actions were taken within the scope of his employment. As to the third element, the Supreme Court has clarified that an employer's agent may act with the required "malice or . . . reckless indifference to the federally protected rights" of an employee even if his conduct would not be considered egregious or outrageous. Rather, for punitive damages to be imposed, the employer's agent "must at least discriminate in the face of a perceived risk that

[his] actions will violate federal law." *Kolstad v. American Dental Association,* 119 S.Ct. at 2125. Justice O'Connor, writing for the Court, enumerated the following examples of intentional discrimination that would not justify the imposition of punitive damages: (1) cases in which the employer is "unaware of the relevant federal prohibition[;]" (2) the employer believes the discrimination is lawful; (3) "the underlying theory of discrimination [is] novel or otherwise poorly recognized[;]" or (4) the employer reasonably believes the "discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability." *Id.*

Applying these parameters to the evidence in the instant case, and noting that the evidentiary determinations in a bench trial or with another jury may have been different, the Court is unable to say a reasonable jury could not have determined Mr. Cook's failure to document and/or report plaintiff's complaint and his subsequent demotion/termination of plaintiff satisfied the "reckless indifference" test. For example, as noted above, Mr. Cook testified he knew that sexual propositions and/or actions which could be interpreted as being taken for personal gain did not constitute appropriate supervisory conduct. Yet, rather than bringing the matter to the attention of the human resources department, he simply chose to categorize it as "a personal thing." (Cook testimony, p. 16.) Additionally, following plaintiff's verbal complaint about Mr. Laborde, Mr. Cook began disciplining plaintiff more harshly for similar infractions, and he did not seek confirmation that she had, or had not, been given permission to spend time in the bus driver's lounge. Combining this information with other evidence of Mr. Cook's inconsistent enforcement of certain company policies, it would not be unreasonable for the jury to conclude that plaintiff's demotion and termination were caus-

ally related to her refusal to accept Mr. Laborde's advances, in violation of her federally protected rights.

Plaintiff must next prove Grand Casino did not make a good faith effort to prevent sexual harassment in the workplace. Although there was evidence Grand Casino had a written sexual harassment policy that included a procedure through which complaints of sexual harassment were to be handled, there was also evidence from which a reasonable jury could infer any such policy was poorly enforced. For example, Sandra Ponthier, who worked in the security department with Mr. Laborde and Ms. Hines, testified that Mr. Laborde and other employees would use the security monitoring system to watch female patrons in the hot tub or on the grounds of the property and would make sexual comments. Ms. Ponthier also stated she left her position at Grand Casino because she felt she was being harassed after she reported that a female co-worker (who was allegedly dating Louis Cook) had violated a company procedure. Additionally, Ms. Ponthier heard Mr. Laborde make a sexually derogatory remark at work about another employee with whom he was romantically involved.

Jamie Bordelon, another security department employee who was supervised by Mr. Laborde and Ms. Hines, confirmed Ms. Ponthier's testimony regarding the voyeuristic use of security cameras. Mr. Bordelon also said Mr. Laborde was romantically involved with at least one woman he supervised at Grand Casino. Kenneth Juneau, a shift manager in the engineering department of Grand Casino, also verified Mr. Laborde's use of the security cameras to observe and comment sexually about women. Additionally, Mr. Juneau described instances in which Mr. Laborde made sexually suggestive comments to plaintiff, and plaintiff appeared to be offended. George McKnight, a security officer at Grand Casino who had worked with Ms. Hines and Mr. Laborde, testified that sexual comments and behavior were not uncommon at Grand Casino. On one particular occasion, Mr. McKnight and several other employees were present in the associate's dining area, a room which accommodated at least twenty people, when Ms. Hines put mayonnaise on a corn dog and used the food to simulate oral sex. Karen Gautreaux, another of plaintiff's co-employees, recalled a similar incident that also occurred in an area accessible to and occupied by other Grand Casino workers.

Reiterating thoughts from this Court's earlier pretrial writings in this case, the extent to which such sexual "looseness" was allowed, or at least ignored, is confounding, particularly in a workplace like a casino, where carnal sensations fuel the company's profits. One would think that the "business" side of the casino would be more tightly controlled, to ensure its employees' potential respect. Yet here, also, we see a plaintiff whose own personality and predispositions allowed her to become a participant at various times in the depravity. In one sense, her conduct could be weighted on the "unwelcomeness" scale. Indeed, this factual scenario, a highly unusual situation of participation in the "looseness" by those on both sides of the case, weaves its way all through the trial and the determinations the Court is presently called upon to make.

Analyzing this evidence in the light of the standard for a judgment as a matter of law, a reasonable jury could find that Mr. Cook's actions were not contrary to any "good faith" efforts of the defendant to prevent sexual harassment in the work-

place. Accordingly, the motion for judgment as a matter of law is DENIED.

### IV. MOTION TO REMIT THE JUDGMENT

#### A. Reduction to Satisfy Statutory Maximum

 Finally, Grand Casino argues the jury's awards of $150,000 for compensatory damages and $200,000 for punitive damages are excessive and lack evidentiary basis in the record. Plaintiff admits the total exceeds the statutory limitation set forth under 42 U.S.C. § 1981a by $50,000, but she contends the awards are otherwise appropriate.

42 U.S.C. § 1981a(b)(3)(D) provides, in pertinent part:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party-
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.[7]

Because the $150,000 compensatory damage assessment comprises approximately forty percent of the jury's $350,000 total, and the $200,000 punitive damage award makes up the remaining sixty percent, the $50,000 reduction required by 42 U.S.C. § 1981a will be apportioned in the same manner. Thus, the compensatory damages are, by statute, decreased by $20,000 to $130,000, and the punitive damages are similarly lowered by $30,000 to

$170,000. The Court now must consider the issue of appropriateness of these reduced numbers

#### B. Compensatory Damages

 "When deciding whether a jury award is excessive, [a court] consider[s] the amount of the award after application of the statutory cap, not the amount given by the jury." *Giles v. General Electric Company*, 245 F.3d 474, 487 (5th Cir.2001). Therefore, the issue is whether Ms. Hines produced sufficient evidence to support a compensatory damage award of $130,000.

 A jury's monetary award for intangible harm, such as the emotional distress alleged by Ms. Hines, is inherently subjective and is entitled to deference. Such deference should be abandoned, however, if the verdict is clearly excessive. The decision to grant or deny a request for remittitur is within the discretion of the trial judge.

> A verdict is excessive if it is contrary to right reason or entirely disproportionate to the injury sustained. While pain and suffering is not easily susceptible to monetary quantification, and the jury has broad leeway, the sky is simply not the limit for jury verdicts ....

*Eiland v. Westinghouse Electric Corporation*, 58 F.3d 176, 183 (5th Cir.1995) (internal quotation marks and citations omitted).

 More than a "nominal" award for emotional damages in a Title VII context must "be supported by competent evidence concerning the injury." *Patterson v. P.H.P. Healthcare Corporation*, 90 F.3d 927, 937–38 (5th Cir.1996), *quoting Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 1052 n. 20, 55 L.Ed.2d 252 (1978).

---

7. In its memorandum supporting the motion to remit the judgment, defendant acknowledged a previous stipulation that Grand Casi-no had more than 500 employees during the relevant time period. (Document No. 98.)

■ The jurisprudence outlines a two-step process for proving emotional distress. First, the plaintiff must show,

> [A] specific discernable injury to [her] emotional state, proven with evidence regarding the nature and extent of the harm.... [H]urt feelings, anger and frustration are part of life, and [are] not the types of harm that could support a mental anguish award.

*Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir.1998) (internal quotation marks and citations omitted).

■ The second step concerns the type of evidence a plaintiff may use to establish an actual injury. While plaintiff's testimony alone may support an emotional distress award, that testimony must consist of more than vague and conclusory allegations. Corroboration and expert testimony, while not always necessary, are preferred in the Fifth Circuit. *Thomas v. Texas Department of Criminal Justice*, 297 F.3d 361, 368 (5th Cir.2002).

In this case, Ms. Hines's testimony regarding her injuries was generalized and non-specific. When asked how the sexual harassment impacted her home life, plaintiff responded that "everything" was affected, "it was very stressful," she would "always come home in a bad mood," she "was always having headaches," she was "very unhappy," and she thought she "probably would take it out on [her] children a lot of times ...." (Excerpted Direct Examination of Katy Juneau, pp. 30–31.) In reference to Mr. Laborde's conduct, plaintiff also stated she was "humiliated," she would sometimes cry, and she "dreaded" going to work, because she did not know what to expect. Given Ms. Hines's long history of headaches[8], her

testimony, standing alone, would be insufficient to establish she suffered any discernable injury, as contemplated by the Fifth Circuit in *Brady* and the cases cited therein.

Plaintiff presented the testimony of her boyfriend, Kenneth Juneau, who explained that when Ms. Hines got headaches, she would complain about the stress of working with Mr. Laborde. From this, Mr. Juneau surmised that working with Mr. Laborde "had a lot to do" with plaintiff's headaches, although Mr. Juneau could not identify any particular pattern regarding the headaches.

Dr. Gerard Dynes, who was accepted by the Court as an expert in the medical field of neurology, told the jury he had been hired by the plaintiff to review her medical records and deposition testimony and to render an opinion regarding whether the stress Ms. Hines claimed to have endured secondary to the sexual harassment would have increased the frequency of her headaches during the period of the harassment. Dr. Dynes explained he never examined or interviewed plaintiff, and he was not even asked to render his opinion until January 2003, more than four years after plaintiff stopped working at Grand Casino.[9] While acknowledging that headaches can have many different causes, Dr. Dynes opined that the stress Ms. Hines attributed to sexual harassment increased the frequency and intensity of her headaches, although he did not quantify the increase. Dr. Dynes also testified that the records he reviewed established Ms. Hines had undergone regular medical treatment for migraine headaches and stress-related headaches from at least 1995 through 2001, well

---

8. Dr. Arsham Naalbandian, a neurologist who treated plaintiff in 1997, testified Ms. Hines gave him a history of having had frequent headaches during the previous seven or eight years.

9. Ms. Hines admitted she did not tell her treating physicians about the sexual harassment. Therefore, those doctors did not relate her headaches to any such harassment.

before and after she was subjected to sexual harassment at Grand Casino.

This evidence is sufficient to establish an undefined, but probably minor, exacerbation of pre-existing headaches as the "discernable injury" needed to form the basis of plaintiff's mental damages claim. Headaches are one example of potential physical manifestations of emotional harm enumerated by the Equal Employment Opportunity Commission's official guideline statement, [EEOC Policy Guidance No. 915.002 § II(A)(2) (July 14, 1992),] which has been cited with approval by the Fifth Circuit. *See Brady,* 145 F.3d at 718.

In determining whether a jury's award for emotional damages is excessive, the Court is to compare the award to amounts approved in cases from the relevant jurisdiction, which cases involve similar injuries. *Thomas,* 297 F.3d at 368. Although seemingly simple, this is actually quite a daunting task. In the Fifth Circuit, the range of awards for emotional damages caused by employment discrimination is extremely broad, even though the evidentiary scenarios are not all that different from one another. As the court in *Salinas v. O'Neill,* 286 F.3d 827, 832 (5th Cir.2002) explained, "[n]o bright-line rule can take account of the variety of evidence and context presented by these types of cases." In *Salinas,* Judge Smith expressed well the dilemma encountered by courts faced with fitting the facts before them into the wide range of emotional damage award cases in the Fifth Circuit when he wrote:

We make no attempt to solve the problem here in the abstract; we simply add another example of an emotional injury, the relevant testimony, and the corresponding award. This may be all that can be done to advance the clarity of this particular corner of federal damages law—offer another anecdote to the slow accretion of reported case law on emotional damages in the hope that future decisions will have more on which to draw.

*Id.*[10]

The following cases illustrate the situation.

A compensatory damage award of $5,000 was found to be within the trial court's discretion in *Migis v. Pearle Vision, Inc.,* 135 F.3d 1041 (5th Cir.1998). Plaintiff, who was successful in her Title VII pregnancy discrimination claim, testified she experienced stress or anxiety attacks, marital difficulties, financial hardships, crying, and sleeplessness as a result of her termination.

In *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803 (5th Cir.1996), the appellate court upheld a jury's compensatory damages award of $7,500 for a plaintiff who presented corroborated testimony that she was embarrassed, belittled, hopeless, and disgusted as a result of her supervisor's harassment.

A Title VII plaintiff who testified he became sick, had difficulty sleeping, suffered from headaches and nausea, and was still under a doctor's care at the time of trial was offered a remittitur of a $300,000

---

**10.** The *Salinas* court reduced the jury's $300,000 emotional damage award to $150,000. In doing so, it stated:

We stress that this amount is neither the minimum nor the maximum for emotional damage claims in discrimination claims. Nor is this amount a floor or ceiling for such claims supported by the testimony of a plaintiff and spouse. All this figure represents is the last dollar amount Salinas can be awarded based on the evidence he presented for the damages he has suffered before that amount would be excessive as a matter of law.

*Id.,* at 833.

jury award for compensatory damages to $10,000. *Vadie v. Mississippi State University*, 218 F.3d 365 (5th Cir.2000).

In *Oden v. Oktibbeha County, Mississippi*, 246 F.3d 458 (5th Cir.2001), the jury's award of $20,000 in compensatory damages for mental anguish and emotional stress was found to be adequately supported by a Title VII plaintiff's testimony that he suffered sleeplessness, betrayal, and shame.

The United States District Court for the Eastern District of Louisiana found a $20,000 award for a scalp laceration and headaches to be reasonable in *Peterson v. State Farm Insurance Co.*, 1994 U.S. Dist. LEXIS 6228 (1994). The court reached this conclusion by developing a range of awards in state court cases involving similar injuries.

Ms. Hines draws the Court's attention to several cases from the Fifth Circuit Court of Appeals in which plaintiffs were awarded up to $100,000 for emotional distress damages resulting from employment discrimination. These cases, which are well-summarized in *Thomas*, 297 F.3d at 369–71,[11] involve situations in which the plaintiffs presented evidence they suffered depression, weight loss, intestinal troubles, marital problems, sleeplessness, headaches, loss of prestige, and loss of social connections.

Ms. Hines argues her testimony, when added to that of Mr. Juneau and Dr. Dynes, establishes her damages are analogous to those for which $100,000 has been approved or awarded by the Fifth Circuit. Plaintiff further contends these cases establish the boundary for awards of this type, and under the "maximum recovery rule," this Court is precluded from reducing the compensatory damage award to less than $100,000 out of deference to the jury.

However, as is noted above, deference is to be abandoned when an award is clearly excessive under the circumstances. This judge, unlike the appellate court judges in the cases relied upon by plaintiff, heard and saw all the evidence presented to the jury. Considering the vague, conclusory testimony of Ms. Hines and her boyfriend as well as the limited and time-distant opinion of the non-treating physician, the Court is shocked at the statutorily-reduced award of $130,000 in compensatory damages.

In point of fact, Ms. Hines's claimed injuries were extremely mild. The reactions about which she testified are not dissimilar to those often demonstrated by many who work forty hours or more per week—bad moods, unhappiness, occasional crying, and lack of enthusiasm for going to work. Her complaints are far closer to the non-compensable hurt feelings, anger, and frustration than to the depression, weight loss, intestinal troubles, marital problems, sleeplessness, loss of prestige, and loss of social connections that would justify a substantial award. Indeed, without the apparently mild exacerbation of pre-existing headaches, this would likely be a zero award case.

Thus, defendant's motion to remit the $150,000 compensatory damage award is GRANTED. The award is reduced to $130,000 in accordance with the statutory cap, and that amount is remitted to

---

11. The *Thomas* court upheld a jury award of $30,000 for past emotional distress to a plaintiff who presented corroborated testimony that she was tearful, felt isolated from her co-workers and helpless, was moody and depressed, could not sleep, suffered from nausea, began dwelling on death, and was prescribed an antidepressant by her physician. The Court also reduced the jury's future emotional damages award from $100,000 to $75,000.

$20,000 unless plaintiff elects a new trial on these damages.

### C. Punitive Damages

■ As is explained in detail above, this Court is not convinced punitive damages are inappropriate in this case. However, the Court must consider whether the *amount* of the award ($200,000, reduced to $170,000 by application of the statutory cap) is excessive.

In *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the Supreme Court implicitly endorsed the Fifth Circuit's method of assessing whether a Title VII punitive damages award is excessive, as that method is explained by *Rubinstein v. Administrators of the Tulane Educational Fund*, 218 F.3d 392 (5th Cir.2000).

■ The first and most important factor impacting the reasonableness of a punitive damages award is "the degree of reprehensibility of the defendant's misconduct." *Campbell*, 123 S.Ct. at 1520. "Reprehensibility" is to be measured,

> [B]y considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.... It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehen-

sible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

*Id.* at 1521.

Applying these factors to the instant case, this Court observes that Grand Casino's conduct certainly should not be held up as a model for other employers. Improper behavior on the part of plaintiff's supervisor was ignored and allowed to continue, despite Ms. Hines's complaint, in an employment atmosphere rife with evidence of lewdness and depravity.[12] The reckless nature of the conduct supports some award of punitive damages. However, the degree of reprehensibility is not significant enough to support $170,000 in punitive damages. Mr. Cook's failure to recognize the situation as one of potentially actionable sexual harassment, while recklessly indifferent, does not rise to the level of maliciousness needed to justify such a large award. The evidence does not show Grand Casino harbored some type of evil motive concerning plaintiff or engaged in trickery or deceit.

■ The second and third guideposts approved by the Supreme Court for measuring the appropriateness of a punitive damages award are as follows:

> [T]he disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and ... the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Campbell*, 123 S.Ct. at 1520.

In this case, plaintiff's compensatory damages have been reduced to $20,000. Although "no bright line exists" regarding

---

**12.** While the law puts no extra duty upon employers such as casinos who profit by appealing to the basest of human emotions, one would hope such companies would be hyper-vigilant in protecting their employees from the reasonably foreseeable side-effects of the atmosphere.

an appropriate ratio between compensatory and punitive damages in general,[13] the multiplier of 150% is not unreasonable under the facts of this case. According to Ms. Hines, her demotion, if she had chosen to accept it, would not have resulted in a decrease in pay. Indeed, she would have simply returned to the duties which she had apparently previously performed quite well.

As to the third guidepost, this Court finds a reduction of the punitive damages award to $30,000 will satisfy the deterrent purposes underlying the assessment of punitive damages in Title VII cases.

Therefore, defendant's motion to remit the $200,000 punitive damage award is GRANTED. The award is reduced to $170,000 in accordance with the statutory cap, and that amount is remitted to $30,000 unless plaintiff elects a new trial on these damages.

### V. CONCLUSION

For the reasons set forth above, defendant's Motion for New Trial (Document No. 97) is DENIED; defendant's Renewed Motion for Judgment as a Matter of Law (Document No. 99) is DENIED; and defendant's Motion to Remit the Judgment (Document No. 98) is GRANTED. Plaintiff is OFFERED A REMITTED SUM of $20,000 on the compensatory damages award and A REMITTED SUM of $30,000 on the punitive damages award. Failing plaintiff's acceptance of same, she will be given a new trial regarding the damages she rejects.

Plaintiff must respond in writing to this offer of remittitur on or before February 28, 2005. Defendant's opposition to plaintiff's pending motion for determination of front pay and back pay damages and for other relief (Document No. 110) need not be submitted until thirty days after plaintiff's response to the remittitur offer is filed.

13. *See Rubinstein,* 218 F.3d at 408.