### U.S. EQUAL OPPORTUNITY EMPLOYMENT COMMISSION

v.

### E.I. DU PONT DE NEMOURS & CO.

No. Civ.A.03–1605.

United States District Court, E.D. Louisiana.

June 6, 2005.

Gregory T. Juge, Michelle T. Butler, Equal Employment Opportunity Commission New Orleans District Office, New Orleans, LA, for U.S. Equal Opportunity Employment Commission.

William David Aaron, Jr., Brian Eugene Sevin, Mark C. Carver, Goins Aaron, P.L.C., New Orleans, LA, for E.I. Du Pont De Nemours & Co.

### ORDER AND REASONS

VANCE, District Judge.

The defendant moves the Court for renewed judgment as a matter of law or, alternatively, a new trial. The defendant also moves the Court to amend the judgment. For the following reasons, the Court DENIES DuPont's motion.

## I. BACKGROUND

Laura Barrios is a 56 year-old woman with severe scoliosis of the lumbar spine, lumbar disc disease with sciatica, lumbar spinal stenosis with compression neuropathy, neurogenic bladder, cervical spondylosis, and previous cervical disc disease with surgical fusions. Barrios has considerable difficulty walking. Barrios began to work for E.I. DuPont de Nemours in its LaPlace chemical plant as a lab operator in 1981. In 1986, Barrios became a lab trainer/operator. In March of 1997, DuPont transferred Barrios to the sedentary position of lab clerk under a number of medical restrictions, such as no standing for more than ten minutes at a time and no walking more than 100 feet without rest.

In May of 1999, the DuPont plant physician ordered Barrios to undergo an functional capacity evaluation (FCE). On July 6, 1999, DuPont received the results of the FCE. On July 7, 1999, DuPont restricted Barrios from walking anywhere on the plant site. At that time, DuPont placed Barrios on short-term disability leave and ultimately discharged her on Total and Permanent disability.

On June 5, 2003, the Equal Employment Opportunity Commission sued DuPont on Barrios's behalf. The EEOC asserted that DuPont forced Barrios to undergo an FCE in violation of the Americans with Disabilities Act, and that DuPont discharged Barrios in violation of the ADA. Before trial, the parties filed cross motions for summary judgment. The Court granted the EEOC's motion for summary judgment in part and denied in part, and the Court denied DuPont's motion in all respects. Specifically, the Court found that DuPont regarded Barrios as disabled un-

der the ADA, but the Court found that issues of fact existed as to whether Barrios was actually disabled under the ADA, whether the ability to evacuate was an essential function of Barrios's job, whether Barrios posed a direct threat to herself or others, and whether DuPont violated the ADA in ordering the FCE.

In October of 2004, the Court held a three-day jury trial in the matter. DuPont moved the Court for judgment as a matter of law at the close of the EEOC's evidence and at the close of all of the evidence. The Court denied both motions, and the case went to the jury. The jury found that DuPont discharged Barrios in violation of the ADA. As a result, the jury awarded Barrios $91,000.00 in back pay, $200,000.00 in front pay, and $1,000,000.00 in punitive damages. The Court later reduced the punitive damages award to the $300,000.00 statutory cap. The jury did not find that DuPont required Barrios to undergo an FCE in violation of the ADA.

DuPont moves the Court for post-trial relief on several grounds. First, DuPont contends that the Court's jury verdict form was defective. Second, DuPont argues that the Court erred in admitting the testimony of Joan Stein, the EEOC's expert on evacuation of individuals with disabilities. Third, DuPont asserts that the evidence is insufficient to establish that (1) Barrios is disabled from walking, (2) Barrios is disabled from working, (3) Barrios could perform the essential functions of her job, and (4) Barrios was not a direct threat. Finally, DuPont argues that the damages award is incorrect. The Court finds that DuPont's arguments are without merit.

## II.  DISCUSSION

### A.  Legal Standards

#### (1)  Judgment as a Matter of Law

The Court will grant judgment as a matter of law under Rule 50 only when the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable jurors could not arrive at a different verdict. *Arsement v. Spinnaker Exploration Co., L.L.C.*, 400 F.3d 238, 248–49 (5th Cir.2005). The Court will consider all of the evidence, and draw factual inferences in favor of the EEOC. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir.2003). The Court, however, leaves credibility determinations, the weighing of the evidence, and the drawing of all legitimate inferences from the facts to the jury. *Id.* A mere scintilla of evidence, however, " 'is insufficient to present a question for the jury' " as " 'there must be a conflict in substantial evidence to create a jury question.' " *Id.* (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir.1997)).

#### (2)  New Trial

Rule 59(a) provides that the Court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. Proc. 59. Therefore, the Court may grant a new trial if it finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. *See Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir.1985). When a party moves for a new trial on evidentiary grounds, the Court will not grant a new trial unless "the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir.1998).

#### (3)  Alter of Amend the Judgment

The Court has considerable discretion to grant or to deny a motion to alter or

amend the judgment under Rule 59(e). *See Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350, 355 (5th Cir. 1993). The Court, however, must "strike the proper balance between the need for finality and the need to render a just decision on the basis of all the facts." *Id.* at 355. Courts in this district hold that a moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in the controlling law. *See Scordill v. Louisville Ladder Group, L.L.C.*, NO. CIV. A. 02–2565, 2004 WL 1118302, at *3 (E.D.La. May 18, 2004).

### B. The Jury Verdict Form

DuPont complains that the jury verdict form was defective because the Court did not submit separate interrogatories on DuPont's direct threat defense and on the elements of punitive damages. Instead, the form asked, "Do you find that DuPont discharged Laura Barrios in violation of the Americans with Disabilities Act?" and "Do you find that DuPont is liable for punitive damages?" At the outset, the EEOC contends that DuPont waived its objection to the form. The Court, however, noted DuPont's objection for the record. (R. at 525.) Accordingly, the Court rejects the EEOC's waiver argument, and the Court will address DuPont's position on the merits.

The Court first instructed the jury to consider whether the EEOC proved the essential elements of its case by a preponderance of the evidence. Specifically, the Court instructed the jury that the EEOC had to prove that (1) Barrios was disabled under the ADA; (2) that she was qualified to perform her job; and (3) that DuPont discharged her because of her disability. *See* 42 U.S.C. § 12112(a). *See also Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1050 (5th Cir.1998). The Court explained to the jury that an employee may be disabled under the ADA in one of three ways. Specifically, the ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The Court also explained that "substantially limits" means:

(i) Unable to perform a major life activity that the average person in the general population population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(1). The Court instructed the jury to consider (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent long-term impact, when determining whether Barrios had a substantially limiting impairment. *Id.* at § 1630.2(j)(2); *see also Hamilton*, 136 F.3d at 1050 (citing the regulations).

The Court also instructed the jury that Barrios was "qualified" to do her job only if she could perform its essential functions, with or without reasonable accommodation. The Court instructed that the essential

functions of a job are the fundamental duties of the position, and not the marginal duties of the position. 29 C.F.R. § 1630.2(n)(1). Additionally, the Court instructed that a reasonable accommodation is a modification to the work environment or the manner in which the employee customarily performs her job that allows a person with a disability to perform the essential functions of the job. 29 C.F.R. § 1630.2(o). The Court explained that under the ADA, a reasonable accommodation may include, but is not limited to, making existing facilities used by employees readily accessible to and usable by individuals with disabilities, job restructuring, reassignment to a vacant position, acquisition or modification of equipment or devices, and adjustment or modification of policies. *Id.* The Court further explained that once an employee protected under the ADA has requested a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation in consultation with the employee.

The Court then instructed the jury that if the EEOC established the essential elements of its claim, the jury must consider DuPont's defense that it justifiably discharged Barrios because she was a "direct threat" to her own safety or to the safety of others. The Court explained that an employer may impose a qualification standard that an employee not pose a "direct threat" to her own health and safety or the health and safety of others. 42 U.S.C. § 12113(a)-(b). *See also Chevron U.S.A., Inc. v. Echazabal,* 536 U.S. 73, 79, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002). The Court explained that an employee is a direct threat if she creates a significant risk to the health or safety of herself others that cannot be eliminated by reasonable accommodation. 42 U.S.C. § 12111(3). *See also Chevron,* 536 U.S. at 79, 122 S.Ct. 2045. Like any other qualifi-

cation standard, the Court explained, a direct threat standard must apply to all employees and not just to employees with disabilities. 29 C.F.R. pt. 1630.2(r) App. The Court instructed the jury that DuPont had the burden to prove its defense by a preponderance of the evidence, and Court further instructed the jury that if DuPont carried its burden, then the jury must find for DuPont.

The Court has broad discretion in the formulation of jury interrogatories. *Sikes v. Gaytan,* 218 F.3d 491, 494 (5th Cir.2000) (citing *Barton's Disposal Serv., Inc. v. Tiger Corp.,* 886 F.2d 1430, 1434 (5th Cir.1989)). Significantly, DuPont does not argue that the verdict form somehow misstated the law, nor does DuPont argue that the Court's instructions to the jury on the elements of the EEOC's claim or the elements of DuPont's direct threat defense were in error or that the verdict form and the instructions were inconsistent with each other. Indeed, the verdict form was not misleading and was easy to understand, particularly when the jury considered the verdict form in light of the Court's jury instructions, which the jury was instructed to do. Moreover, DuPont cites no authority to support its argument that separate interrogatories on its direct threat defense were required. On the contrary, the Fifth Circuit has affirmed a district court's decision to combine the issues of liability and affirmative defense into a single interrogatory. *Sikes,* 218 F.3d at 494 (affirming district court's decision to combine issues of liability and the defense of qualified immunity into a single interrogatory).

Similarly, DuPont complains that the jury verdict form was defective with regard to punitive damages. The Court instructed the jury that it may award punitive damages if the EEOC proved that

DuPont intentionally discriminated against Barrios with malice or reckless indifference to Barrios's federally protected rights. *Williams v. Trader Publishing Co.*, 218 F.3d 481, 487 (5th Cir.2000). The Court explained that this means that DuPont must have discriminated in the face of a perceived risk that its actions will violate federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 537, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). The Court also explained that in the punitive damages context, DuPont may not be liable for the discriminatory employment decisions of its managerial agents when those decisions are contrary to DuPont's good-faith efforts to comply with the law. *Id.* at 545, 119 S.Ct. 2118.

As noted *supra*, the Court has broad discretion in the formulation of jury interrogatories. Again, DuPont does not argue that the verdict form somehow misstated the law, nor does DuPont argue that the Court's instructions to the jury on punitive damages were in error or that the verdict form and the instructions were inconsistent with each other. Instead, the verdict form along with the Court's jury instructions provided an accurate statement of the law. DuPont cites no authority to support its argument that the Court had a duty to interrogate the jury on the individual elements of a punitive damages claim. Indeed, the Court has no such duty. Accordingly, the Court finds that DuPont's argument that the jury form was defective is without merit.

### D. The Testimony of Joan Stein

DuPont argues that it is entitled to judgment as a matter of law or a new trial because it contends that the Court erred in admitting the testimony of Joan Stein, the EEOC's expert on evacuation of individuals with disabilities. First, DuPont complains that Stein was not qualified because

she has no formal education in the ADA. DuPont, however, fails to identify the formal ADA education it contends is necessary to such an expert's qualifications.

Second, DuPont complains that Stein is not "accredited as an expert." The Court finds that DuPont fails to show that Stein lacked some necessary type of accreditation. It is true that during its examination of Stein, DuPont pointed out that Stein is not accredited in the ADA or accredited by the International Council of Building Officials. But, Stein testified without contradiction that there is no organization that performs ADA accreditation. (Testimony of Stein at 214.) Moreover, DuPont fails to explain why accreditation by the ICBO is essential to qualify Stein as an expert. Indeed, DuPont fails to explain what the ICBO is. Additionally, DuPont offers no professional opinion that Stein should have had ICBO accreditation in order to be qualified to testify as an expert.

█ Moreover, the trial evidence demonstrates that Stein was sufficiently qualified to testify as an expert on the basis of her extensive experience. Among other things, Stein has served as the president and CEO of Accessibility Development Associated, Inc., an Americans with Disabilities Act consulting firm, since 1992. (Testimony of Stein at 201.) Her company works with businesses and corporations, educational institutions, and governmental entities to facilitate compliance with the ADA. (Testimony of Stein at 202, 203.) She works with architects and building owners in the design phase of new facilities, and she reviews existing facilities to determine their accessibility and recommend ways to improve accessibility. (Testimony of Stein at 202–06.) Emergency evacuation planning is a part of every facility review Stein conducts, and Stein has conducted more than 800 facility reviews herself and has supervised more than 5,000

facility reviews. (Testimony of Stein at 206.) Additionally, Stein has developed approximately 20 emergency evacuation plans for employers and building owners in the last five years. (Testimony of Stein at 207.) Stein has given more than 130 speeches on the ADA and accessibility, and she has given 15 speeches on emergency evacuation and planning. (Testimony of Stein at 210.) Her speeches are approved for continuing education credit for lawyers, architects, engineers, facility managers, real estate agents, and insurance professionals. (Testimony of Stein at 210.) Clearly, Stein's experience qualified her to testify as an expert in emergency evacuation of individuals with disabilities. DuPont had ample opportunity to explore any weaknesses in Stein's expertise and experience on cross-examination. *See Thompson v. Amerada Hess Corp.*, NO. CIV. A. 96–3265, 1998 WL 274260, at *4 (E.D.La. May 26, 1998) (no error when court heard expert testimony because expert was sufficiently qualified by experience, and opponent had ample opportunity to explore weaknesses on cross-examination).

■ DuPont also argues that the Court erred in admitting Stein's testimony about her business partner's use of a wheelchair on the basis of relevance. Evidence is relevant if it has any tendency to make any material fact more or less probable than it would be without the evidence. Fed.R.Evid. 401. The Court finds that Stein's testimony as to her partner's ability to evacuate in a wheelchair was relevant because an issue in this case was whether Barrios could safely evacuate in the event that she needed to be accommodated with a wheelchair. Stein's testimony as to how her partner evacuates their office building in the event of an emergency tends to make it more probable that an individual in a wheelchair can safely evacuate.

**E. Actual Disability: Walking and Standing**

■ DuPont argues that there was insufficient evidence to support a verdict that Barrios was disabled in walking or standing. As the Court instructed the jury, an individual is disabled, *i.e.*, substantially limited, in walking or standing when she is unable to walk or stand or is significantly limited in the ability to walk or stand compared to an average person in the general population. *See* 29 C.F.R. § 1630.2(j)(1). *See also Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1050 (5th Cir.1998).

The jury received substantial evidence from which it could have reasonably concluded that Barrios was substantially limited in walking and/or standing. First, several witnesses testified that Barrios is substantially limited in walking. Specifically, Barrios testified that she is substantially limited in both walking and standing as compared to an average person. (Testimony of Barrios at 531, 534.) Similarly, Barrios's husband, Raymond Barrios, testified that Barrios walks substantially differently from an average person, that she limps, and that she walks at half the speed of an average person. (Testimony of Raymond Barrios at 415–16, *see also* testimony of Barrios at 533.) Barrios's personal physician, Dr. Christy Montegut, opined that Barrios is substantially limited in walking as compared to an average person, and Dr. Montegut has approved Barrios for handicapped license plates. (Testimony of Montegut at 446, 434–35.) Finally, the DuPont human resources representative, Monk Ordeneaux, stated that, in his opinion, Barrios is substantially limited in walking as compared to an average person. (Testimony of Ordeneaux at 335.) In contrast to the several witnesses who testified that Barrios is substantially limited in walking, no witness testified that

she is not substantially limited in walking or standing.

Second, Barrios's impairment not only curtails her mobility to a significant degree, but also it causes her extreme pain every day. (Testimony of Barrios at 101, 188; *see also* testimony of Montegut at 446 (noting that Barrios's pain is severe).) Barrios has taken medication for several years to combat pain. (Testimony of Barrios at 105, 108–09.) As Dr. Montegut opined, pain can be debilitating, and Barrios's pain prevents her from walking more than a quarter of a mile. (Testimony of Montegut at 446, 438.) Further, as Barrios testified, she is unable to stand for more than ten to fifteen minutes at a time, and if she were to stand for an hour without rest, she would experience severe pain for several days afterwards. (Testimony of Barrios at 534.)

Third, DuPont placed several physical restrictions on Barrios as a result of her impairment. For example, several years earlier, DuPont restricted Barrios from heavy lifting and extended standing. (Testimony of Barrios at 106.) Then, in September of 1996, DuPont restricted Barrios from climbing stairs and straight ladders, standing for more than ten minutes at a time, walking more than 100 feet without stopping to rest, lifting more than 20 pounds, bending, twisting, stooping, and working around moving machinery. (Testimony of Barrios at 114–15.) Although medical restrictions are not dispositive of whether Barrios is substantially limited in walking, the jury could have found them probative of her physical condition. Notably, DuPont considers its restrictions to be based on "medical necessity." (Testimony of Ordeneaux at 245–46.)

Similarly, according to DuPont, it was not safe for Barrios to walk in her office building, which consists of smooth, flat surfaces. (Testimony of Ordeneaux at 265;

testimony of Clay at 501.) This is because DuPont considered Barrios to be at risk of falling. (Testimony of Ordeneaux at 266.) The jury could have reasonably concluded that, unlike Barrios, an average person in the general population could walk safely on smooth, flat surfaces. Furthermore, the FCE that DuPont ordered Barrios to undergo revealed that she is significantly unstable while walking heel to toe and that she uses improper body mechanics. (Testimony of Barrios at 171; testimony of Burns at 392.) Ultimately, the DuPont plant physician who placed the 1996 restrictions on Barrios testified that Barrios's inability to walk is a continuous concern, *i.e.* "at home, work, or wherever." (Testimony of Burns at 399–400.)

Finally, DuPont repeatedly encouraged Barrios to retire on Total and Permanent disability since 1986 (testimony of Barrios at 102–03; testimony of Raymond Barrios at 403), and DuPont ultimately discharged Barrios on Total and Permanent disability. Under DuPont's Total and Permanent disability policy, "Total and Permanent disability means you are *totally disabled* by injury or disease and presumably are totally and permanently prevented from doing any gainful work, as determined by DuPont." (Testimony of Ordeneaux at 270; *see also* Pl.'s Ex. 518 at 258.) Although evidence that DuPont encouraged Barrios to retire on disability and ultimately discharged her on disability is not dispositive of whether she was actually disabled, the jury again could have found it probative of her physical condition. *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary,* NO. 3:01–CV–1287–P, 2002 WL 31245379, at *3 (N.D.Tex. Oct.1, 2002)(noting that "[w]hile receipt of Social Security Disability benefits are not conclusive proof that [the plaintiff] was disabled, it is indicative of disability").

In the face of all of this evidence, DuPont argues that the evidence was insufficient for the jury to have concluded that Barrios was disabled in walking or standing. This is because Barrios does not use assistive devices when she walks. (*See* testimony of Barrios at 164–65.) Although the use of an assistive device is probative of whether an individual is substantially limited in walking or standing, the use of an assistive device is not the *sine qua non* of being substantially limited in walking or standing. Thus, the appropriate inquiry is not simply whether Barrios uses an assistive device. Instead, the inquiry is whether Barrios is "[s]ignificantly restricted as to the condition, manner, or duration" in which she can walk or stand as compared to an average person in the general population. 29 C.F.R § 1630.2(j)(1)(ii). *Cf. also Toyota Motor Mfg., Kentucky Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)(noting that Congress intended the existence of a disability to be determined on a case-by-case basis).

DuPont also argues that Barrios is not substantially limited in walking or standing because Barrios has some ability to walk. For example, Barrios can walk a steep levee, albeit with difficulty, on occasion. (Testimony of Barrios at 545; testimony of Raymond Barrios at 421.) Barrios, however, testified that walking a levee on a daily basis would be physically "devastating" to her. (Testimony of Barrios at 536.) DuPont also notes that Barrios can walk up the five steps leading to her house, walk short distances without experiencing shortness of breath, and walk two city blocks without experiencing shortness of breath. (Testimony of Barrios at 165–66.) Evidence that Barrios has some ability to walk, however, does not necessarily establish that Barrios is not substantially limited in walking. Indeed, the jury could have reasonably concluded that Barrios's abilities are substantially restricted compared to an average person. This is because it would be reasonable to conclude that someone who is unable to climb more than five steps at a time regularly, walk more than a short distance without stopping for rest, or walk more than two city blocks without experiencing shortness of breath is significantly limited in walking as compared to an average person.

In light of all of the evidence presented at trial, the Court concludes that there was sufficient evidence to support the jury's conclusion that Barrios is substantially limited in walking or standing. Further, although DuPont relies on several cases to argue that Barrios is not substantially limited in walking or standing, none of the individuals in those cases was as limited as Barrios. *See Rossbach v. City of Miami,* 371 F.3d 1354, 1359 (11th Cir.2004)(plaintiffs contending that they could not walk for "extended periods of time" were not disabled from walking because evidence of purported disabilities "was couched in vague terms and unaccompanied by any evidence that the described afflictions were any worse than is suffered by many adults"); *Penny v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir.1997)(no disability when evidence is only that plaintiff limps on occasion and it sometimes hurts to walk); *Kelly v. Drexel Univ.,* 94 F.3d 102, 106 (3d Cir.1996)(plaintiff not disabled when he could walk a mile, but could not jog and climbed stairs more slowly than he had in the past); *Harmon v. Sprint United Mgmt. Corp.,* 264 F.Supp.2d 964, 969 (D.Kan.2003)(plaintiff not disabled when he could, *inter alia,* walk one half mile and mow the lawn); *Miller v. Airborne Express,* NO. 3:98–CV–0217–R, 1999 WL 47242, at *5 (N.D.Tex. Jan.22, 1999)(plaintiff not disabled from standing when he could stand continuously for one half hour); *Stone v. Entergy Services, Inc.,* CIV. A. NO. 94–2669, at *3–4 (E.D.La.

June 20, 1995) (plaintiff not disabled from walking when he could not run, had limited endurance, and walked more slowly than others, but his doctor testified that he was not disabled). Therefore, DuPont's argument is without merit.

Accordingly, the Court denies DuPont's motion with respect to whether the jury could have found that Barrios was actually disabled. The Court must uphold the jury's verdict unless there is no legally sufficient evidentiary basis to support it. As the evidence is sufficient to prove that Barrios was actually disabled from walking and/or standing, the Court need not reach DuPont's contention that the evidence was insufficient to support a conclusion that Barrios was disabled from working.[1]

### F. Essential Functions

■ DuPont argues that there is insufficient evidence that Barrios could perform the essential functions of her job. This is because, according to DuPont, Barrios could not walk in the event of an emergency evacuation. As noted *supra*, the essential functions of a job are the fundamental duties of that position. 29 C.F.R. § 1630.2(n)(1). Marginal duties of a position are not essential functions. *Id.* A job duty or function may be considered essential because, *inter alia*, one of the reasons the job exists is to perform that function, or because there are a limited number of employees available among whom the performance of that job function can be distributed, or because the function is highly specialized, and the employee in the position was hired for his or her expertise or ability to perform that particular function. *Id.* at § 1630.2(n)(2). Evidence of whether a particular function is essential includes, but is not limited to, DuPont's own judg-

ment as to which functions are essential, the existence of written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time an employee spends performing the function on the job, the consequences of not requiring the incumbent to perform the function, the work experience of past incumbents in the job, and/or the current work experience of incumbents in similar jobs. *Id.* at § 1630.2(n)(3).

■ The jury could have reasonably concluded from the testimony of the witnesses for both sides that evacuating was not an essential function of the job of a DuPont lab clerk. Indeed, DuPont's human resources representative, Ordeneaux, testified (1) that evacuating is not an essential function of Barrios's job under his interpretation of the ADA, (2) that evacuating is not part of Barrios's job description, and (3) that Barrios performed all of her essential job functions. (Testimony of Ordeneaux at 248–50, 299.) Likewise, vocational rehabilitation expert Douglas Kuylen opined that emergency evacuation "would not be a central function of her job." (Testimony of Kuylen at 374, 375–76.)

In addition to these opinions, the evidence showed that Barrios never had to evacuate, and Barrios's office building never had to evacuate during her 18 years of employment. (Testimony of Barrios at 141, 143; *see also* testimony of Ordeneaux at 249; testimony of Stein at 225.) Although Pat Murphy, a DuPont security and emergency planning and response employee, testified that the threat of an emergency is ever-present at the DuPont plant and the ability to evacuate is important, he also testified that the likelihood of

---

1. The Court also found on summary judgment that DuPont regarded Barrios as disabled. Therefore, even if the jury found that Barrios was not actually disabled, it still had to consider the rest of the essential elements of the EEOC's case.

an emergency actually occurring is improbable. (Testimony of Murphy at 448, 461.) Ultimately, there was sufficient evidence in the record for a jury to reasonably conclude that evacuating was not an essential function of Barrios's job.

Moreover, even if evacuating were an essential function of Barrios's position, there was ample evidence from which the jury could conclude that Barrios could, in fact, evacuate by walking in the event of an emergency. Although Dr. Burns restricted Barrios from walking on the plant site, Barrios demonstrated that she could walk an evacuation route from her old office building to the farthest rally point and back in 2003. (Testimony of Ordeneaux at 290; testimony of Kuylen at 369–70; testimony of Stein at 222.) Barrios did not require assistance during the evacuation, nor did she fall during the evacuation. (Testimony of Ordeneaux at 290; testimony of Kuylen at 370; testimony of Stein at 223.) Although Barrios's ability to walk the evacuation route in 2003 is not dispositive of her ability to walk the evacuation route in 1999, it is probative of her abilities in 1999.[2] Kuylen opined that Barrios could safely evacuate the DuPont plant by walking. (Testimony of Kuylen at 375; *see also* testimony of Ordeneaux at 292–93 (noting that, although the route that Barrios walked was only one possible route and was over smooth terrain, Barrios can safely evacuate based on what he observed).) Likewise, Joan Stein, an expert in the evacuation of people with disabilities, opined that Barrios can evacuate safely by walking without posing a threat to herself or to others. (Testimony of Stein at 223, 229.)

Not only did the evidence show that Barrios could safely evacuate by walking, but also the evidence showed that Barrios could safely evacuate with accommodation. Ordeneaux testified that DuPont was concerned about Barrios's ability to evacuate over uneven terrain, and Ordeneaux identified as an area of concern a drainage ditch that is 24 inches deep and 10 to 12 inches wide. Ordeneaux, however, admitted that Barrios could possibly have crossed the ditch in a wheelchair had DuPont placed plywood or metal grates over it, or had fellow employees lifted her over the ditch. (Testimony of Ordeneaux at 277–79.) In the alternative, Barrios could have evacuated with other assistive devices, such as crutches or a walker. (Testimony of Ordeneaux at 287, 294, 290–91; testimony of Stein at 224, 227–29.) There was also evidence that a motorized wheelchair or scooter would have been a reasonable accommodation, even recognizing that DuPont prohibited the use of non-emergency vehicles during emergencies. This is because DuPont's policy is based on the possibility that a vehicle will produce a spark, and motorized wheelchairs and scooters come with spark-free gel batteries. (Testimony of Stein at 119, 229; testimony of Ordeneaux at 280–81; 285.) Additionally, DuPont could have provided Barrios with an escort, or DuPont could have evacuated Barrios on a stretcher. (Testimony of Ordeneaux at 287, 291; testimony of Stein at 227.) Accordingly, the jury could have reasonably concluded that evacuating was not an essential function of Barrios's job, and even if it was, the jury could have reasonably concluded that Barrios could have evacuated with or without accommodation.

### G. The Qualification Standard of No Direct Threat

DuPont argues that the jury's conclusion that DuPont did not prove that Barrios

---

**2.** The Court notes that Barrios asked to demonstrate that she could walk an evacuation route at the time of her discharge in 1999, but DuPont denied her request. (Testimony of Barrios at 139; testimony of Ordeneaux at 272.)

posed a direct threat is clearly erroneous. As the Court instructed the jury, an employer may require, as a qualification standard, that an employee not pose a direct threat to herself or others. 29 C.F.R. pt. 1630.2(r) App. A direct threat is a significant risk of substantial harm to the health or safety of the individual or other persons that cannot be eliminated by reasonable accommodation. 29 C.F.R. § 1630.2(r). In order to determine whether Barrios was a direct threat, the Court instructed the jury to consider (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r). Furthermore, the determination as to whether a direct threat exists must be based on a specific personal assessment of Barrios's ability to safely perform the essential functions of her job. 29 C.F.R. pt. 1630.2(r) App. This assessment is based on either a reasonable medical judgment that relies on the most current medical knowledge, or on the best available objective evidence. *Id.* An employer cannot rely on generalized fears about risks to individuals with disabilities to disqualify an individual with a disability. *Id.* Likewise, a slightly increased risk or a remote or a speculative risk is not sufficient to amount to a direct threat. *Id.* DuPont bore the burden to prove its direct threat defense.

■ The evidence indicated that the likelihood of an emergency evacuation at the DuPont plant is slim, and the risk of substantial harm to Barrios was not imminent. (Testimony of Murphy at 461; testimony of Ordeneaux at 288–89.) Barrios never had to evacuate in her 18 years at DuPont, nor did her building ever have to evacuate while Barrios worked at DuPont. (Testimony of Barrios at 141, 143; *see also* testimony of Ordeneaux at 249; testimony

of Stein at 225.) Moreover, although the testimony at trial indicated that there is a continuous risk of a life-threatening chemical explosion at DuPont (testimony of Ordeneaux at 319, 321; testimony of Murphy at 448, 461; testimony of Kuylen at 376), the evidence showed that Barrios could evacuate safely with or without accommodation in the event of such an emergency. (*See* Section II.F., *supra. See also* testimony of Stein at 230 (opining that Barrios did not pose a direct threat to herself in the event of an emergency evacuation).) Accordingly, there was sufficient evidence for the jury to reject DuPont's direct threat defense.

DuPont cites three cases in support of its argument that it proved that Barrios was a direct threat in the event of an emergency evacuation. Those cases, however, are inapposite. First, in *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002), the Supreme Court affirmed the EEOC's regulation that gives an employer a defense to a charge of discrimination on the basis of an employee's threat to himself. The employer in the case, a chemical refinery, discharged the plaintiff because exposure to the chemicals at the refinery would exacerbate his liver disease. *Id.* at 76, 122 S.Ct. 2045. Contrary to DuPont's representation, the case never addressed or even mentioned the ability to evacuate.

In *Rios v. Indiana Bayer Corp.,* 965 F.Supp. 919 (S.D.Tex.1997), the plaintiff, an employee with a prosthetic leg, worked in a chemical plant. The plaintiff's doctor restricted him from, *inter alia,* working more than eight hours at a time, lifting more than 50 pounds, and climbing ladders. *Id.* at 920. The plaintiff successfully worked in the chemical plant as a clerk under his restrictions from 1984 to 1994. *Id.* In 1994, the plaintiff applied for a position as a production technician. *Id.*

Production technicians were required to work rotating 12–hour shifts, carry heavy equipment, and climb ladders. *Id.* at 923. Production technicians also had special emergency duties, and in the event of an emergency were required to move quickly throughout the unit to fix problems and rescue other personnel. *Id.* The plaintiff's employer rejected his application because the plaintiff could not perform the functions of a production technician with or without accommodation. *Id.* at 920. The court found that the plaintiff could not perform the essential functions of the position, and the court noted that the plaintiff could pose a safety threat if he could not quickly evacuate the unit or rescue other personnel. *Id.* at 924. Significantly, unlike Barrios, the *Rios* plaintiff applied for a position that required him to perform special emergency duties. In light of the clear differences in the positions at issue, the Court finds that Barrios's situation is simply not analogous to the situation in *Rios*.

Similarly, Barrios's situation is distinguishable from *Wilson v. Phillips Petroleum Co.*, NO. 2:97–CV–439–J, 1998 WL 874835 (N.D.Tex. Dec.8, 1998). In *Wilson,* the plaintiff, who suffered from bipolar disorder, worked as a pump engine mechanic at a refinery. One day, she entered a manic episode at work and thought that God told her a bomb had been placed in the refinery and that she had to find it. *Id.* at *1. After the incident, the employer discharged the plaintiff. *Id.* at *2. The plaintiff admitted that she could not perform her job during a manic episode, with or without accommodation. *Id.* She also admitted that she posed a safety threat during a manic episode. *Id.* The court determined that recognizing emergencies, reacting to emergencies, activating alarm systems, and rescuing other employees were duties of all employees. *Id.* at *4. Notably, the plaintiff had experienced emergency incidents in the course of her employment requiring her to extinguish fires and rescue others who had been gassed or badly burned. *Id.* at *1. The court found that the plaintiff would be unable to perform her duties and that she would pose a direct threat if she experienced a manic episode at work. *Id.* at *4.

*Wilson* is distinguishable from the present case. First, the nature of the disability is different. Second, the *Wilson* plaintiff had experienced several emergency situations in the past, and she had been required to take certain actions in response to those emergency situations. Barrios, on the other hand, did not encounter an emergency situation in 18 years at DuPont, and DuPont does not contend that Barrios would be charged with special emergency duties, such as rescuing other personnel and extinguishing fires. Ultimately, it appears that the probability of an emergency occurring at the *Wilson* plant is greater than the probability of a similar event at DuPont. Furthermore, the *Wilson* plaintiff admitted that she could not perform her job, even with accommodation. Here, on the other hand, the evidence was sufficient to show that Barrios could both perform her job and evacuate the DuPont facility in the event of an emergency. *Wilson,* like the two other cases upon which DuPont relies, is simply not analogous.

## H. Damages

### (1) Back Pay

■ Back pay is an equitable remedy available to claimants under the ADA. The Court typically decides the availability of equitable relief, such as back pay. *See Giles v. Gen. Elec. Co.,* 245 F.3d 474, 492 (5th Cir.2001)(noting that back pay is equitable); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 423 n. 19 (5th Cir.1998)(not-

ing that back pay is a question for the court, not the jury); *Wilson v. Belmont Homes, Inc.*, 970 F.2d 53, 55 (5th Cir. 1992). Under Federal Rule of Civil Procedure 39(c), however, the parties may consent to a trial by jury on the issue of back pay even though the ADA does not expressly authorize one. *See Gloria v. Valley Grain Prods., Inc.*, 72 F.3d 497, 499 (5th Cir.1996)(noting that the parties consented to a trial by jury in a Title VII action and affirming the jury's award of back pay). Here, the parties requested a trial by jury on all issues, with the exception of front pay. (R. Doc. 70, Pretrial Order at 35.) Therefore, the parties effectively requested a trial by jury on the issue of back pay, and neither disputes that they did for the purposes of this motion. *See Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir.2000)(finding that the parties impliedly consented to have the jury determine the availability of back pay under the ADA). Under Rule 39(c), the jury's verdict "has the same effect as if trial by jury had been a matter of right." FED. R. CIV. P. 39(c).

■■■ The jury awarded Barrios $91,000.00 in back pay. At the time of her discharge, Barrios earned $48,000.00 per year. (Testimony of Barrios at 152.) In the five years since her termination, Barrios earned approximately $28,000.00 per year in benefits. (Testimony of Barrios at 151–52.) This means that the jury awarded Barrios approximately $20,000.00 per year in back pay.

DuPont contends that the award of back pay is either incorrect or excessive because Dr. Montegut testified that Barrios would have been unable to work beginning in June of 2001. (Testimony of Montegut at 440.) But Dr. Montegut later testified that Barrios's back is stable, and her real limitation comes from the pain associated with her impairment. (Testimony of Mon-

tegut at 446.) Moreover, Barrios testified that if she could have worked during that time without losing her benefits, she would have. Likewise, Kuylen opined that Barrios was capable of working. (Testimony of Kuylen at 374.) Kuylen based his opinion on a review of Barrios's medical records and an examination of Barrios actually performing the functions of her lab clerk position at DuPont in 2003. (Testimony of Kuylen at 365–68.) Although there is a conflict in the evidence as to whether Barrios could have worked beyond June of 2001, the jury could have reasonably concluded that she could have. Furthermore, the amount of back pay that the jury awarded has a sufficient basis in the evidence. Accordingly, DuPont's objection to the award of back pay is without merit.

### (2) Reinstatement and Front Pay

■■■■■ DuPont argues that an award of front pay is inappropriate because, according to DuPont, the EEOC presented no evidence as to whether reinstatement was appropriate. The Court decides the availability of equitable relief such as reinstatement and front pay. *See, e.g., Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir.1992) ("Since front pay is an equitable remedy, the district court rather than the jury should determine whether an award of front pay is appropriate, and if so, the amount of the award."); *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir.1991) (same); *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 823 (5th Cir. 1990) (same); *Daigle v. Liberty Life Ins. Co.*, Civ. A. No. 94–1594, 1995 WL 224418, at *1 (E.D.La.1995) (same). Reinstatement is the preferred remedy for a discriminatory discharge. *Julian v. City of Houston, Texas*, 314 F.3d 721, 728 (5th Cir.2002). When there is discord or hostility between the parties, however, reinstatement may not be feasible. *See Pol-*

lard v. E.I. duPont de Nemours & Co., 532 U.S. 843, 850, 121 S.Ct. 1946; 150 L.Ed.2d 62 (2001)(noting that hostility may make reinstatement not feasible). When reinstatement is not feasible, front pay is the appropriate remedy. *Julian,* 314 F.3d at 728.

■■■ The Court finds that reinstatement is not a feasible remedy in this case because the relationship between the parties is hostile. For example, Barrios testified that Internicola, the person who made the ultimate decision to discharge her, stated that he did not want to see her "crippled, crooked self going down the hall, hugging the walls anymore." (Testimony of Barrios at 140.) According to both Barrios and her husband, DuPont tried repeatedly to force Barrios out on Total and Permanent disability. DuPont first suggested it in 1986, and continued to "harass" Barrios about retiring on disability for the rest of her tenure at DuPont. (Testimony of Barrios at 102–03; testimony of Raymond Barrios at 403.) When she married Raymond Barrios, DuPont increased the pressure on her to retire on Total and Permanent disability, asserting that she would be entitled to her husband's health benefits. (Testimony of Barrios at 103–04; testimony of Raymond Barrios at 403.)

Moreover, the evidence shows that Barrios suffered an emotional toll as a result of DuPont's discrimination against her. The emotional baggage that Barrios carries as a result of DuPont's discrimination would likely affect her work performance to such an extent that reinstatement is not an adequate remedy. For example, Barrios testified that she has had nightmares about getting fired ever since she left the plant in 1999. (Testimony of Barrios at 196–98.) Before she returned to DuPont for the EEOC site review in 2003, Barrios experienced stress for several weeks, and

she had difficulty sleeping for several nights leading up to it. (Testimony of Barrios at 530–31.) Furthermore, the evidence that DuPont recklessly disregarded Barrios's rights under the ADA, discussed in depth below in connection with the punitive damages award, only confirms that reinstatement is not a feasible option. Finally, DuPont maintained throughout the course of the litigation that Barrios is not qualified to work at DuPont. Even though the jury found that Barrios is, in fact, qualified to work at DuPont, DuPont's hostile position, along with all of the other evidence of the relationship between Barrios and DuPont, precludes the Court from imposing a remedy of reinstatement.

Because reinstatement is not feasible, the Court must determine whether Barrios is entitled to front pay. As noted *supra,* the Court decides the issue of the availability and the amount of front pay damages. The Fifth Circuit has held, however, that a district court may determine the availability and amount of front pay with the assistance of an advisory jury. *See, e.g., Julian,* 314 F.3d at 728 n. 25 (noting that a district court may determine front pay damages with an advisory jury if it wishes); *Rutherford v. Harris County,* 197 F.3d 173, 188 (5th Cir.1999) (same); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 423 n. 19 (5th Cir.1998) (same); *see also* FED. R. CIV. P. 39(c). Given the speculative nature of front pay damages and that "[t]he courts must employ intelligent guesswork to arrive at the best answer," *Reneau,* 945 F.2d at 870, the Court submitted the issue of front pay to the jury on an advisory basis. Here, the jury recommended a front pay award of $200,000.00. The Court finds that the jury's award was reasonable, and the Court adopts it.

■■■ Front pay "compensates the plaintiff for lost income from the date of judgment to the date the plaintiff obtains

the position she would have occupied but for the discrimination." *Floca v. Homcare Health Svs., Inc.,* 845 F.2d 108, 112 (5th Cir.1988). As the Court instructed the jury, in determining an award of front pay, relevant factors include how long Barrios worked at DuPont, the permanency of her position, the nature of her work, her age, her physical condition, possible consolidation of jobs, and any other factor that may have impacted her employment relationship with DuPont. *Reneau,* 945 F.2d at 871.

■ The first issue that the Court must determine with regard to front pay is the length of time for which Barrios is entitled to compensation. The Court finds that an award of front pay until Barrios reaches age 65 is reasonable, and the Court notes that the jury's award reflects such a determination. This is because Barrios would have remained at DuPont for the rest of her working life. *See Burns v. Texas City Refining, Inc.,* 890 F.2d 747, 753 n. 4 (5th Cir.1989) (noting that the court must find that the plaintiff would have remained at her job for the rest of her working life in order to justify an award of front pay for the rest of the plaintiff's working life). Barrios worked at DuPont for 18 years before DuPont illegally discharged her. Additionally, the work history of other DuPont employees who testified at trial indicates that it is not uncommon for DuPont employees to be career employees. (*See* testimony of Ordeneaux at 281 (stating that he has worked for DuPont for 35 years); testimony of Raymond Barrios (stating that he worked for DuPont for 30 years); testimony of Internicola at 341 (stating that he worked for DuPont for 23 years).) *See Williams v. Pharmacia Opthalmics, Inc.,* 926 F.Supp. 791, 796 (N.D.Ind.1996)(considering the length of time that other employees worked for the employer). Moreover,

Barrios is currently 56 years old. *See Mathieu v. Gopher News Co.,* 273 F.3d 769, 779 (8th Cir.2001)(affirming award of front pay until employee reached 65, indicating that the longer employee worked for his employer, and the older he is at the time of his discharge, the more likely it is that an award of front pay until the end of the employee's working life is reasonable); *Davis v. Combustion Eng'g,* 742 F.2d 916, 923 (6th Cir.1984)(noting that the older an employee is, the more likely an award of front pay until the end of her working life is reasonable). Barrios's age combined with her tenure at DuPont and the evidence that shows that career employees are not unusual at DuPont indicates that Barrios would have likely remained at DuPont until she reached retirement age.

Additionally, the Court finds that Barrios would not have been subject to termination for poor work performance. This is because Barrios successfully performed her job duties as a lab clerk. (Testimony of Ordeneaux at 248–49.) Moreover, Barrios likely would have continued to work despite her physical impairment. Significantly, Barrios's trial testimony revealed her to be both committed and hard-working. (*See, e.g.,* testimony of Barrios at 137 (describing her efforts to get her job back), 149 (stating that she did not want to be a burden on the government by accepting social security benefits because she could work), 193 (stating that her physical impairment did not prevent her from doing the work she had always done).) In addition, Kuylen opined that Barrios could physically perform her lab clerk position based on her medical records and his observations of Barrios actually performing her job duties. (Testimony of Kuylen at 374, 365–68.) Additionally, although Dr. Montegut questioned whether Barrios would have been able to continue working because of her severe pain, he testified that her back condition is stable. (Testi-

mony of Montegut at 440, 446.) Furthermore, the evidence showed that Barrios has a high tolerance for pain. (Testimony of Barrios at 101 (stating that she has lived with considerable pain for years and has developed a high tolerance for pain as a result); testimony of Raymond Barrios at 416–18 (stating that Barrios has a high threshold for pain and noting that, for example, she chose the undergo a double knee replacement and stayed in the hospital for only five days even though Aetna approved her for 20 days).)

Not only does the Court find it unlikely that Barrios would have stopped working for DuPont due to her impairment, but also the Court finds it unlikely that Barrios would have left DuPont to pursue other opportunities. Barrios testified that there is no other business within her local area where she could work for pay comparable to what she received at DuPont, and DuPont offered nothing to refute Barrios's testimony. (Testimony of Barrios at 150.) Significantly, DuPont treats lab clerks, who essentially function as secretaries, the same in terms of pay and seniority as lab operators, who are skilled technical industrial operators and whose jobs are significantly more physically demanding. (Testimony of Ordeneaux at 247–48.) *See Llampallas v. Mini–Circuits Lab, Inc.,* No. 93–2053–CIV–ATKINS, 1995 WL 693211, at *3 (S.D.Fla. July 11, 1995)(awarding front pay for 15 years, *i.e.,* for the remainder of the plaintiff's working life, because the plaintiff would be unable to find a job with a comparable salary). Therefore, it is unlikely that Barrios would have left DuPont in pursuit of other opportunities. Accordingly, the Court finds that an award of front pay until Barrios reaches age 65, *i.e.,* an award covering nine years, is reasonable in this case.

■ Barrios made $48,000.00 per year when DuPont discharged her. There was evidence that Barrios received regular pay increases during her tenure at DuPont. For example, Barrios started at DuPont in 1981 making $8.89 per hour. (Pl.'s Ex. 520.) Within her first five years, Barrios received six step progressions and ultimately made $14.66 per hour in 1985. (Pl.'s Ex. 520.) At 40 hours per week, this comes out to approximately $30,492.00 per year. From 1985 to 1999, when her salary was $48,000.00 per year, Barrios's pay increased by an average of approximately $1,250 per year. (*See* Pl.'s Ex. 520, 551.) On the basis of this evidence, it was reasonable for the jury to adjust Barrios's front pay award to reflect modest pay increases. (*See* Pl.'s Ex. 520, 551.)

Additionally, as the Court instructed the jury, future income, such as Barrios's annual disability benefits, must be subtracted from the front pay award. Furthermore, the Court instructed the jury to discount Barrios's front pay award to present value by considering the interest that Barrios could earn on the award if she made a relatively risk-free investment. Ultimately, the jury arrived at an award of $200,000.00. Taking all relevant factors into account, including reduction to present value at a rate of approximately two percent, the jury's figure is reasonable. Accordingly, the Court adopts it.

DuPont argues that the jury's award is excessive because, according to DuPont, the jury awarded Barrios ten years of front pay at $20,000.00 per year, without reducing to present value. DuPont's characterization of the front pay award is incorrect, as the jury's award reflects consideration of the proper factors. Therefore, the Court rejects DuPont's objection to the front pay award.

*(3) Mitigation*

■ DuPont contends that any award for wage loss is incorrect because, accord-

ing to DuPont, Barrios failed to mitigate her damages. This is because Barrios did not get another job after DuPont discharged her on Total and Permanent disability. Plaintiffs have a responsibility to exercise reasonable diligence under the circumstances to minimize their damages. *Sellers v. Delgado Coll. (Sellers II)*, 902 F.2d 1189, 1193 (5th Cir.1990). Therefore, plaintiffs have the duty to accept alternative employment that is substantially equivalent to their former job in terms of opportunities, compensation, working conditions, and status. *Id.* DuPont bore the burden to prove that Barrios failed to mitigate her damages. *Id.* To meet its burden, DuPont must have shown that substantially equivalent work was available to Barrios and that Barrios did not exercise reasonable efforts to obtain it. *Id.* If, however, DuPont proved that Barrios did not use reasonable efforts to mitigate her damages, DuPont does not have to show that there was substantially equivalent work available to Barrios. *Id.*

■ There is sufficient evidence to show that Barrios mitigated her damages. First, Barrios tried repeatedly to get her job at DuPont back after DuPont illegally discharged her. (Testimony of Barrios at 137–38; testimony of Ordeneaux at 272.) For example, Barrios offered to buy her own wheelchair or golf cart, or even ride a bicycle at work. (Testimony of Barrios at 137.) DuPont refused her requests. (Testimony of Barrios at 137.) Barrios also asked to demonstrate to DuPont that she could, in fact, walk the evacuation route, but DuPont refused her request. (Testimony of Ordeneaux at 272.) Barrios's attempts to get her job back are a form of mitigation. *See West v. Nabors Drilling U.S.A., Inc.*, 330 F.3d 379, 393–94 (5th Cir.2003) (finding that the plaintiff's attempts to be re-hired by his former employer were attempts at mitigation).

In addition to trying to get her job back, Barrios mitigated her damages by accepting disability benefits. Significantly, Barrios testified that there were no opportunities in the LaPlace, Louisiana area in which she could make an amount of money comparable to the amount she was making at DuPont. (Testimony of Barrios at 150.) As noted *supra*, lab clerks are equivalent in the DuPont hierarchy in terms of pay and seniority to skilled technical industrial operators whose jobs are more physically demanding. (Testimony of Ordeneaux at 247–48.) Barrios's testimony that, as a person in her 50's, she could not have started afresh in a secretarial position with a new employer in the same area of Louisiana area making close to $50,000.00 per year is not unreasonable. Indeed, the Court notes that before she started at DuPont, Barrios made only $21,000.00 per year. (Pl.'s Ex. 520.) Barrios further explained that if she had taken another job with a lesser salary, she would have been at risk of losing her disability benefits. (Testimony of Barrios at 150.) The outcome of such a situation is that Barrios would have made less money if she sought alternative employment than she would have received on disability benefits. (Testimony of Barrios at 150.) Accordingly, DuPont's argument that Barrios failed to mitigate her damages is not supported by the record. Furthermore, DuPont offered nothing to controvert Barrios's testimony, and James Gregg, a DuPont personnel relations consultant, admitted that Barrios could have lost some of her disability benefits had she sought alternative employment. (Testimony of Gregg at 515, 520–21.)

DuPont notes that the Fifth Circuit stated in *Sellers v. Delgado Comm. Coll. (Sellers I)*, 839 F.2d 1132, 1139 (5th Cir.1988), that if an employer proves that an employee "has not made reasonable efforts to

obtain work," the employer does not have to show that substantially equivalent work was available to the plaintiff. As the Fifth Circuit has since explained, however, "*Sellers* did not create . . . a legal threshold for measuring the duty to mitigate injury." *Hill v. City of Pontotoc*, 993 F.2d 422, 426 (5th Cir.1993). Instead, "[w]hether an injured person has mitigated [her] damages requires a factual assessment of the reasonableness of [her] conduct." *Id.* at 427; *see also Sellers II*, 902 F.2d at 1193 ("The reasonableness of a Title VII claimant's diligence 'should be evaluated in light of the individual characteristics of the claimant and the job market.' ") (*quoting Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983)).

For example, in *Hill v. City of Pontotoc*, the plaintiff applied for only two jobs in the two years after he was fired from his job as fire chief: one with an employer that had no openings, and another with an employer that could not hire him because of his participation on an oversight commission. 993 F.2d at 426–27. While the plaintiff was fire chief and after his discharge, he also served as the County Fire Coordinator, earning $500.00 per month. *Id.* at 427. The plaintiff testified that he applied for no other jobs because alternative employment would cause him to lose his position as County Fire Coordinator. *Id.* Instead, the plaintiff started his own business. *Id.* The Fifth Circuit ruled that, despite the plaintiff's failure to persistently pursue alternative employment, he had mitigated his damages because "[s]elf-employment may be a reasonable alternative to seeking other employment for purposes of mitigation." *Id.*

Barrios's case is akin to the situation in *Hill.* She explained that she did not seek opportunities with another employer because she would lose her disability benefits and ultimately be worse off than if she simply accepted DuPont's disability benefits and did not seek alternative employment. The Court finds that accepting disability benefits was a reasonable alternative to seeking a position with another employer in light of Barrios's particular circumstances. Accordingly, the Court finds that DuPont did not carry its burden on mitigation.[3]

### (4) Punitive Damages

■ DuPont argues that the evidence is insufficient to support the jury's award of punitive damages. The Court instructed the jury that it was empowered to award punitive damages if it found that DuPont intentionally discriminated against Barrios with malice or reckless indifference to her federally protected rights. *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 476 (5th Cir.2002). This means that the employer "must at least discriminate in the face of a perceived risk that its actions will violate" the ADA. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). DuPont is not liable for the discriminatory employment decisions of its managerial agents when those decisions are contrary to DuPont's good-faith efforts to comply with the law. *Hatley*, 308 F.3d. at 477.

■ The Court finds that the jury's award of punitive damages is supported by the evidence. The jury could have reasonably concluded that DuPont intentionally discriminated against Barrios with malice or reckless disregard for her rights under the ADA on the testimony of DuPont's official representative at trial, Ordeneaux.

---

**3.** The jury was instructed on mitigation, and the jury apparently found no failure to mitigate.

Ordeneaux's testimony established that DuPont is aware of its responsibilities under the ADA. (Testimony of Ordeneaux at 326; *see also* testimony of Gregg at 512 (stating that it is DuPont's policy to follow the ADA).) And, over the course of the trial, Ordeneaux admitted that (1) Barrios is disabled under the ADA, (2) Barrios performed all of the essential functions of her job, (3) evacuating was not an essential function of Barrios's job, and (4) Barrios could have evacuated the plant with or without accommodation. (Testimony of Ordeneaux at 334–35 (admitting that Barrios's restrictions reflect DuPont's medical opinion of her physical condition and that based on her restrictions, Barrios was substantially limited in, *inter alia*, walking), 248–49 (admitting that Barrios performed all of the essential functions of her job as a lab clerk), 250 (admitting that evacuating was not an essential function of Barrios's job under the ADA), 292–93 (noting that Barrios could safely evacuate based on what he observed during the EEOC site review), 277–79 (admitting that Barrios could have been accommodated with a wheelchair and metal grates over the ditch), 287, 294, 290–91 (admitting that Barrios could have been accommodated with assistive devices and other accommodations).)

Moreover, the jury could have reasonably concluded that DuPont failed in its duty to reasonably accommodate Barrios even though DuPont was aware of its responsibility to do so under the ADA. Ordeneaux said that DuPont management had conversations about accommodating Barrios before terminating her, but his testimony was vague and devoid of any specifics. (*See, e.g.,* testimony of Ordeneaux at 271 (vaguely stating that DuPont explored "all the options").) Joe Internicola, the ultimate decision-maker, could not recall whether those conversations ever actually occurred. (Testimony of Internicola at 343–44 (admitting that he had no recollection of any conversation about accommodating Barrios), 346–47 (admitting that he could not recall spending any time determining whether Barrios could be accommodated instead of discharged).) Furthermore, Barrios testified that she called DuPont with several ideas for accommodations and even offered to pay for them herself. (Testimony of Barrios at 137–38.) DuPont, however, summarily rejected all of Barrios's suggestions. (Testimony of Ordeneaux at 272–74.)

There was also evidence from which the jury could have concluded that DuPont intentionally tried to prevent Barrios from doing her job, or at least made things more difficult for Barrios, in light of her impairment. For example, at one point DuPont made a change in one of its computer programs. (Testimony of Barrios at 119.) The change necessitated much extra work for the lab clerks. (Testimony of Barrios at 119.) Barrios said that all of the other clerks worked a lot of overtime in an effort to complete their work. (Testimony of Barrios at 119.) DuPont, however, had restricted Barrios from working overtime. As a result, Barrios had eight hours to complete the same amount of work that the other clerks could put in unlimited overtime to complete. (Testimony of Barrios at 119.) Additionally, as a lab clerk, Barrios used a printer frequently. (Testimony of Barrios 119–20.) All of the lab clerks' printers were next to their desks, except Barrios's. (Testimony of Barrios at 119–20.) Barrios's printer was more than 100 feet down the hall. (Testimony of Barrios at 119–20.) This created a difficult situation for Barrios in light of DuPont's restriction prohibiting Barrios from walking more than 100 feet without stopping for rest. The computer department recommended moving Barrios's printer closer to her desk, but DuPont

refused. (Testimony of Barrios at 119–20.) The jury could have concluded from the foregoing that DuPont either used Barrios's restrictions to make it more difficult for her to do her job, or that DuPont disregarded the unique issues that Barrios presented. *See Hardin v. Caterpillar, Inc.,* 227 F.3d 268, 271 (5th Cir.2000)(upholding a punitive damage award for pregnancy discrimination in light of evidence that the management was unreceptive to pregnancy and illness claims). Indeed, the jury could have interpreted DuPont's responses to the unique issues Barrios presented as evidence of hostility towards individuals with disabilities. *Id.* at 273 (noting that the employer's response to absentee claims within the context the pregnant employee presented could have been interpreted as expressing hostility towards pregnant employees).

Additionally, there was ample evidence from which the jury could conclude that DuPont's direct threat defense was a thinly veiled pretext for discrimination. Notably, although DuPont's stated purpose for terminating Barrios was a purported inability to evacuate, DuPont never actually tested Barrios to see whether she could evacuate. (Testimony of Ordeneaux at 272.) Indeed, when Barrios asked for an opportunity to demonstrate that she could evacuate in an effort to get her job back, DuPont refused to let her. (Testimony of Ordenneaux at 272.) In fact, Ordeneaux admitted that Barrios could evacuate. Furthermore, the jury could have concluded that DuPont's purported requirement that all employees be able to walk in the event of an emergency evacuation did not apply to all employees—instead, it applied only to Barrios. This is because there was evidence that other employees who were more mobility-impaired than Barrios were not barred from the plant on the basis of safety and evacuation concerns. (Testimony of Barrios at 145–47, testimony of Or-

deneaux at 292–94.) *Hines v. Grand Casino of La., L.L.C.,* 358 F.Supp.2d 533, 546–47 (W.D.La.2005)(affirming the jury's decision to award punitive damages award in a sexual harassment suit because the employer applied company policies inconsistently to the plaintiff and other, similarly situated workers).

The jury could have also considered DuPont's repeated efforts to convince Barrios to retire on disability. In this regard, there was evidence from which the jury could have concluded that DuPont knew that Barrios should not retire on disability, but DuPont pressured her to do it anyway. This is because, in an effort to persuade Barrios to retire on disability, a DuPont doctor commented that Barrios's neurologist was "too ethical" to provide the requisite medical documentation to qualify Barrios for disability benefits, but that perhaps her personal care physician could be convinced to write the necessary letter to DuPont's disability insurance carrier. (Testimony of Barrios at 106.) The jury may have concluded from this evidence that DuPont wished to force out an individual with a disability whether she could work or not—a reprehensible view with respect to individuals with disabilities. *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 942 (5th Cir.1996)(affirming a punitive damages award when the employer's actions demonstrated reprehensible views on race relations). Tellingly, when Internicola made the final decision to terminate Barrios, he admitted that he did not review Barrios's personnel file, her medical file, or her FCE. (Testimony of Internicola at 345–46.) Instead, Internicola admitted that once the plant physician restricted Barrios from walking on the plant site, the final decision was made. (Testimony of Internicola at 349.)

The last time Barrios spoke with Ordeneaux about possibly getting her job back

was when she received her 18–years of service plaque. (Testimony of Barrios at 140.) According to Barrios, Ordeneaux told her it was a "done deal," and the bottom line was that Joe Internicola said that he did not want to see her "crippled crooked self, going down the hall hugging the walls" anymore. (Testimony of Barrios at 140; *but see* testimony of Internicola at 351–52 (denying that he made the remark).) The jury could have concluded, on the basis of this evidence, that DuPont discharged Barrios on the basis of animus towards individuals with disabilities. *See Patterson,* 90 F.3d at 942 (upholding a punitive damages award when the employer used racial epithets). Ultimately, there is ample evidence from which the jury could have concluded that DuPont discriminated against Barrios with both malice and reckless indifference to her rights under the ADA. Accordingly, the Court rejects DuPont's objection to the punitive damages award on this ground.

DuPont argues that it is not liable because Ordeneaux and Gregg testified that DuPont's policy is to follow the law with regard to the ADA. (*See* testimony of Gregg at 512; testimony of Ordeneaux at 326.) The jury, however, could have rejected Ordeneaux's and Gregg's statements on the basis that they were simply conclusory assertions. There was no evidence that DuPont had a written or publicized employee anti-discrimination policy. There was no evidence of employee training. There was no evidence of an employee discrimination grievance procedure. *Compare Hatley,* 308 F.3d at 477 (finding that the employer established the good faith defense to punitive damages because the employer had a well-publicized policy forbidding discrimination, gave training to new employees, established a grievance procedure, and initiated an investigation into the plaintiff's complaint), *with Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,*

188 F.3d 278, 286 (5th Cir.1999) (finding that evidence that the employer encouraged employees to contact management with grievances did not establish the good faith defense to punitive damages as a matter of law and noting that the employer provided no evidence of any specific anti-discrimination efforts). The evidence was sufficient for the jury to conclude that DuPont did not make good faith efforts to comply with the ADA.

▪ DuPont argues in the alternative that the jury cannot award punitive damages when it does not award compensatory or nominal damages unless the defendant violated the plaintiff's constitutional rights. In this regard, DuPont notes that front pay and back pay are not considered "compensatory" under section 1981a, the civil rights damages provision applicable to the ADA. *See* 42 U.S.C.1981a(b)(2). Therefore, DuPont contends that Barrios cannot recover punitive damages because she did not receive a compensatory damages award under section 1981a. What appears to be underlying DuPont's argument is the common law policy that prohibits punitive damages when the plaintiff has not suffered any actual harm.

▪ At the outset, nothing in the language of section 1981a limits punitive damages awards to cases in which the plaintiff receives compensatory damages within the meaning of section 1981a. *See Provencher v. CVS Pharmacy,* 145 F.3d 5, 11 (1st Cir.1998); *Hennessy v. Penril Datacomm Networks,* 69 F.3d 1344, 1352 (7th Cir. 1995). Moreover, the common law policy is inapplicable in situations in which a civil rights plaintiff has received damages for wage loss. This is because damages for wage loss redress actual harm, even though they are not labeled as "compensatory" under section 1981a. Indeed, the Fifth Circuit has referred to damages for

wage loss as compensatory. *Rubinstein v. Adm'rs of Tulane Educ. Fund,* 218 F.3d 392, 407 (5th Cir.2000). Furthermore, although the Fifth Circuit has never squarely addressed the issue of whether a civil rights plaintiff can recover punitive damages in the absence of a compensatory damages award within the meaning of section 1981a, it has affirmed a punitive damages award under those circumstances. *See Rubinstein,* 218 F.3d at 407 (in which the plaintiff received damages for wage loss but no compensatory damages within the meaning of section 1981a). Additionally, every court of appeals that has directly encountered the issue has held that a compensatory damages award is not necessary to sustain a punitive damages award under section 1981a. *See Salitros,* 306 F.3d at 575; *Corti,* 304 F.3d at 344; *Cush–Crawford v. Adchem Corp.,* 271 F.3d 352, 359 (2d Cir.2001); *W & O,* 213 F.3d at 615; *Provencher,* 145 F.3d at 12; *Hennessy,* 69 F.3d at 1352. *See also Jimenez v. Paw–Paw's Camper City, Inc.,* NO. CIV. A. 00–1756, 2002 WL 257691, at *10–11 (E.D.La. Feb.22, 2002). Accordingly, the Court holds that "the common law policy prohibiting punitive damages where the plaintiff has not shown any harm is not implicated where the plaintiff has shown wage loss." *Salitros v. Chrysler Corp.,* 306 F.3d 562, 575 (8th Cir.2002). *See also Corti v. Storage Tech. Corp.,* 304 F.3d 336, 344 (4th Cir.2002) (holding that the plaintiff was entitled to punitive damages even though she did not receive "compensatory" damages under section 1981a because she was awarded back pay, which is compensatory in nature); *U.S. Equal Employment Opportunity Comm'n v. W & O, Inc.,* 213 F.3d 600, 615 (11th Cir.2000)(same); *Provencher,* 145 F.3d at 11–12 (same); *Hennessy,* 69 F.3d at 1352 (same).

DuPont relies on *Louisiana ACORN Fair Housing v. LeBlanc,* 211 F.3d 298, 303 (5th Cir.2000), in support of its argument. *LeBlanc* does not control here for two reasons. First, *LeBlanc* applies to the Federal Fair Housing Act, not the ADA. Second, the jury in *LeBlanc* did not award the plaintiff any actual damages. Instead, the jury awarded him only punitive damages. Therefore, *LeBlanc* is not analogous because the jury in this case awarded Barrios actual damages in the form of wage loss.

DuPont also cites *Girard v. Brinker Intern. Payroll Corp.,* 58 Fed.Appx. 595, 2003 WL 261776, at *1 (5th Cir.2003), in support of its argument. In *Girard,* however, the plaintiff was entitled to neither compensatory damages nor lost wages. *Id.* The Fifth Circuit premised the denial of punitive damages on the absence of any *actual* damages, not the absence of compensatory damages within the meaning of section 1981a. *Id.* ("[T]here is no basis for the award of lost wages and employment benefits to Girard. Because the award of actual damages cannot be sustained, Girard also loses her punitive damage award."). Therefore, like *LeBlanc, Girard* is not analogous. Accordingly, DuPont's objection to the punitive damages award on this ground is without merit.

■ DuPont also argues in the alternative that the punitive damages award is excessive. The jury awarded Barrios $1,000,000.00 in punitive damages, which the Court later reduced under section 1981a to $300,000.00. To determine whether punitive damages are excessive, the Court must consider the degree of reprehensibility of DuPont's conduct, the disparity between the harm Barrios suffered and the punitive damages the jury awarded to her, and the difference between the punitive damages award and the extent of the civil penalties authorized in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123

S.Ct. 1513, 155 L.Ed.2d 585 (2003); *Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir.2003).

DuPont argues that its conduct was not reprehensible. As noted *supra*, however, the evidence was sufficient for a jury to conclude that DuPont held reprehensible views with respect to individuals with disabilities, DuPont repeatedly tried to force Barrios out on disability even though it knew she did not qualify for it, DuPont refused to consider accommodating Barrios *in lieu* of discharging her, and DuPont acted with indifference or hostility to the unique issues Barrios presented. Ultimately, there was sufficient evidence for the jury to conclude that DuPont engaged in a pattern of intentionally discriminatory and malicious conduct. This is sufficient to warrant a punitive damages award of $300,000.00. *Compare Rubinstein*, 218 F.3d at 408 (reducing punitive damages award when the case involved only a single act of retaliation).

Moreover, the ratio of punitive to actual damages is reasonable. Although the Supreme Court has never set a specific ratio of punitive damages to actual damages that is *de facto* reasonable, the Court has suggested that a 1:1 ratio may be appropriate when actual damages are substantial. *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513. Here, Barrios's punitive damages are $300,000.00 and her actual damages are $291,000.00, which is almost a 1:1 ratio. This is a far cry from the ratios of punitive to actual damages that the Supreme Court has found questionable. *See id.* at 426, 123 S.Ct. 1513 (finding a 145:1 ratio of punitive to actual damages excessive); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)(finding a 500:1 ratio of punitive to actual damages excessive). *See also Rubinstein*, 218 F.3d at 407–09 (reducing a punitive damages award that was 30 times the actual dam-

ages award to an award that was ten times the actual damages award). The Court finds that the punitive damages award is not grossly excessive in relation to her actual damages award or in relation to the maximum award that she could have received. Accordingly, the Court rejects DuPont's objection that Barrios's punitive damages award is excessive.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES DuPont's motion.